**PLANNED PARENTHOOD OF SOUTHERN ARIZONA, INC., Planned Parenthood of Central and Northern Arizona, Inc., Joel B. Bettigole, M.D., and Frederic N. Stimmell, M.D., and on their patients, Plaintiffs,**

**v.**

**Grant WOODS, in his official capacity as Attorney General of the State of Arizona; and Barbara Lawall, in her official capacity as County Attorney for he County of Pima, and as representative for all other prosecuting attorneys similarly situated throughout the State of Arizona, including, without limitation, City Attorneys, Defendants.**

**No. CIV. 97–385–TUC–RMB.**

United States District Court, D. Arizona.

Oct. 27, 1997.

Diana J. Simon, Korn, Waterman & Simon, Tucson, AZ, Lawrence J. Rosenfeld, O'Connor, Cavanagh, Anderson, Killingsworth & Beshears, Phoenix, AZ, Eve C. Gartner, Planned Parenthood Federation, New York City, for plaintiffs.

Thomas P. McGovern, Arizona Atty. Gen., Phoenix, AZ, William J. Ekstrom, Co. Atty., Kingman, AZ, Bruce W. Green, Sp. Asst. to Co. Atty., Washington, DC, for defendants.

## ORDER

BILBY, Senior District Judge.

### I. *Introduction/Procedural History.*

The Plaintiffs have filed a declaratory and injunctive action pursuant to 42 U.S.C. § 1983 which challenges the constitutionality of 1997 Arizona House Bill 2113 (codified at Ariz.Rev.Stat.Ann. § 13–3603.01)("the Act"). The Act criminalizes a practice which is called "partial birth abortion" by providing that "[a] person who knowingly performs a partial birth abortion and who kills a human fetus is guilty of a class 6 felony." *See* Ariz.Rev.Stat.Ann. § 13–3603.01(A).

After granting a temporary restraining order, which prohibited the Act from taking effect, the Court certified a defendant class consisting of all prosecuting attorneys in Arizona, and then designated class representatives. *See* Order dated July 18, 1997. The Court set a hearing on the request for preliminary injunction. By agreement of the parties, the hearing on the preliminary injunction was combined with a trial on the merits. The two-day trial was held on September 18–19, 1997, at which time the Court heard the testimony of four witnesses. Following the trial, the parties stipulated to the admission of three deposition transcripts for the Court to also consider as testimony. The Court also heard oral argument from counsel, and permitted the parties to file post-hearing briefs. In addition, the Court permitted an *amicus curiae* brief to be filed by certain members of the Arizona State Legislature who voted for the Act.

### II. *Issues Presented.*

There are three (3) issues which the Court considered with regard to the Act:

1) Whether the Act unconstitutionally burdens a woman's right to terminate a nonviable fetus;

2) Whether the Act is void for vagueness; and

3) Whether the Act creates impermissible spousal and parental consent mandates.

In considering these issues, the Court has made numerous findings of fact based upon the evidence presented. These findings of fact have led to the Court's conclusions of law which resolve these issues.

### III. *Findings of Fact.*

The Court finds the following facts to be true:

### A. *The Parties.*

1. Plaintiff Planned Parenthood of Southern Arizona, Inc. ("PPSA") is a non-profit healthcare provider based in Tucson, Arizona which provides abortions up to sixteen weeks from the first day of the woman's last menstrual period ("LMP").

2. Plaintiff Planned Parenthood of Central and Northern Arizona, Inc. ("PPCNA") is a non-profit healthcare provider based in Phoenix, Arizona which currently provides abortions up to sixteen weeks LMP.

3. Plaintiff Joseph B. Bettigole, M.D., is a physician licensed to practice in the State of Arizona. Dr. Bettigole performs abortions at PPSA in Tucson as well as in his private practice in Phoenix. Among the abortions performed by Dr. Bettigole are those in which the woman is in the second-trimester of pregnancy.

4. Plaintiff Frederic N. Stimmel, M.D., is a physician licensed to practice in the State of Arizona. Dr. Stimmell is the medical director at PPCNA where he also performs abortions. Among the abortions performed by Dr. Stimmel are those in which the woman is in the second-trimester of pregnancy.

5. The class of Defendants which has been certified for purposes of this action includes all prosecuting attorneys in Arizona. In certifying this class, the Court recognized that the class was so numerous that joinder was impractical, and that there were questions of law or fact which are common to the class.

### B. *Plaintiffs' Witnesses.*

#### Dr. Joel Bettigole

6. Dr. Bettigole is a board certified physician in obstetrics and gynecology who is a graduate of Harvard University and Albany Medical College. Dr. Bettigole was also an Assistant Clinical Professor at Tufts University and at Boston University Medical Center.

7. Nearly all of Dr. Bettigole's current medical practice is in performing abortions. Prior to 1983, Dr. Bettigole delivered approximately 7000 children.

8. In his current private practice, Dr. Bettigole performs abortions up to twenty weeks LMP. At PPSA, Dr. Bettigole currently performs abortions up to sixteen weeks LMP.

9. Ninety percent of Dr. Bettigole's practice involves termination of pregnancies in the first-trimester.

10. Dr. Bettigole's patients express many different reasons for terminating pregnancy in the second-trimester, as opposed to during the first-trimester, including that: a) they did not realize that a pregnancy had progressed to the second-trimester, b) they experience a change in a life situation, such as a husband leaving them, c) a fetal abnormality is discovered which was not known before the second-trimester, and d) the woman develops medical problems during pregnancy or a medical problem becomes worse during pregnancy.

11. For a first-trimester abortion, Dr. Bettigole uses the suction curettage method. This method is accomplished by dilating the cervix with instruments and then suctioning the uterine cavity with a small cannula. This method cannot be used past the twelve or thirteenth week of pregnancy.

12. After the fourteenth week of pregnancy, the standard abortion procedure used by Dr. Bettigole is dilatation and evacuation, or "D & E". This procedure involves dilating the cervix overnight with either laminaria or another chemical substance. Following dilation, the fetal tissue is extracted. A "D & E" procedure can be performed on an outpatient basis. It can also be performed throughout the entire second-trimester of pregnancy, prior to viability.

13. When performing a "D & E", the fetus may be removed disarticulated, or it may be removed intact. It may be necessary to compress the skull of the fetus if the body is removed intact and the head remains trapped in the uterus.

14. When beginning a "D & E" procedure, a physician does not know if a fetus will be removed disarticulated, or if it will be removed intact.

15. Dr. Bettigole has also used the induction procedure to perform second-trimester abortions. This procedure involves the use of chemicals to cause a woman to go into premature labor and pass the fetus. An induction procedure cannot be performed on an outpatient basis. The induction procedure can usually not be performed until a woman is sixteen weeks LMP. In an induction procedure, it is sometimes necessary to compress the skull of the fetus if the head cannot pass through the uterus.

16. A hysterotomy is a third way known to Dr. Bettigole to terminate a second-trimester pregnancy. A hysterotomy is the equivalent to a Caesarian section in a viable fetus. Dr. Bettigole has never used a hysterotomy for abortion purposes. A woman must be hospitalized for a hysterotomy. There is greater chance of morbidity in performing the hysterotomy than in performing either the induction procedure or the "D & E" procedure.

17. In both the "D & E" and the induction procedures, a portion of the fetus may come through the cervical os and into the vaginal cavity while the fetal heart is still beating. A physician performing either of these procedures cannot predict when this is going to happen.

18. Dr. Bettigole fears prosecution under the Act if it were to go into effect.

19. The effect of the law would be that Dr. Bettigole and other physicians would stop providing "D & E" and induction procedure abortions, which are the methods by which almost all second-trimester abortions are performed.

### Dr. William Meyer

20. Dr. Meyer is a board certified obstetrician/gynecologist who is licensed to practice in Arizona. He attended the University of Delaware and Thomas Jefferson University Medical Center.

21. Dr. Meyer is employed at Kino Community Hospital in Tucson, Arizona as the Chief of Obstetrics and Gynecology.

22. Kino Community Hospital has approximately 12,000 clinic visits per year.

23. Kino Hospital does not do elective terminations of pregnancies. Approximately 50 to 75 women each year are referred by the Kino Hospital clinic to other health care providers for abortions. Three to five of those referrals are for second-trimester abortions.

24. The patient population at Kino Hospital is mostly indigent. The indigent patient population is less likely to seek out medical care in a timely manner.

25. The types of situations for which Dr. Meyer has referred out patients for second-trimester abortions include situations where the woman's physical health can seriously deteriorate during pregnancy, such as where the woman has diabetes mellitus, systemic lupus, or severe hypertension. Dr. Meyer has also referred out women for second-trimester abortions where the fetus is found to have severe anomalies.

26. A diagnosis of a fetal anomaly usually does not occur until the second-trimester.

27. If second-trimester abortions were not available in Tucson, many of the patients of Kino Hospital would not be able to obtain a second-trimester abortion because they do not have the means to travel outside of Arizona.

28. Dr. Meyer would fear criminal prosecution if the law went into effect.

*Dr. Philip Darney*

29. Dr. Darney is a Professor of Obstetrics and Gynecology at the University of California, San Francisco. He is board certified in obstetrics and gynecology and preventive medicine.

30. Dr. Darney had conducted research in the area of women's health, and has published over 100 articles, four books, and various book chapters regarding preventive care for women, abortion, contraception, and surgery for women.

31. He describes his present work as an "academic physician" who teaches, conducts clinical research, and cares for patients with residence fellows and medical students at San Francisco General Hospital, which is the public hospital in San Francisco.

32. Dr. Darney is involved in providing a full range of abortion services, including suction evacuation, dilation and evacuation, and induction procedures.

33. Dr. Darney does approximately 200 abortions per year, which, over the course of his career, totals several thousand.

34. Dr. Darney's abortion practice at San Francisco General Hospital involves providing abortions for indigent women or abortions which are state funded, as well as for women from all socioeconomic classes who have special medical problems, such as heart disease, bleeding or clotting problems, or fetal anomalies.

35. Due to the client population of San Francisco General Hospital, approximately one-third of the abortions performed there are in the second-trimester. The client population served is one in which sexual abuse is common and children become pregnant. Children are more likely to delay the termination of their pregnancy because they do not know that they are pregnant. The client population seen by Dr. Darney also consists of a high number of drug users as well as homeless women. Dr. Darney believes that this population delays termination of their pregnancies beyond the first-trimester because these women have difficulty in controlling their lives.

36. Dr. Darney also sees many women at San Francisco General Hospital who want to carry a fetus to term, but who are unable due to health problems or fetal anomalies. Examples of such health problems seen recently by Dr. Darney where women had second-trimester abortions are breast cancer, diabetes, and cardiac problems.

37. In the case of fetal anomalies, a woman may not know until the 18th week of pregnancy that the fetus she is carrying has no chance of life, or no chance of meaningful life, outside of the womb.

38. In addition to the above examples, there are additional situations where a woman delays until the second-trimester to have an abortion. Such situations often seen by Dr. Darney include social changes where a partner leaves a woman, or where a woman is already poverty stricken with the children that she has, or where a partner is physically abusing a woman.

39. In reviewing the Act, Dr. Darney believes that it could apply to any type of second-trimester abortion.

40. Discretion of the physician and the informed choice of the patient are essential in choosing the type of abortion to be performed.

41. It is not always clear to a physician as to when an abortion is necessary to save the life of a woman, or if it is just necessary to prevent deterioration of the health of the mother.

### Dr. Stanley Henshaw

42. Stanley Henshaw, Ph.D, is the Deputy Director of Research at the Alan Guttmacher Institute in New York. The Alan Guttmacher Institute is a non-profit organization that does research, public education and policy analysis on issues related to reproductive health care. This Institute has some connection to Planned Parenthood.

43. Dr. Henshaw obtained his Ph.D in sociology from Columbia University and his specialty is in reproductive epidemiology.

44. Dr. Henshaw has conducted studies in areas such as the availability of abortion services, abortion rates, abortion rates of various subgroups, and reasons for abortions.

45. In reviewing the Abortion Surveillance Report published by the Arizona Department of Health Services, Dr. Henshaw concludes that 91% of the abortions performed in Arizona are in the first-trimester.

46. The risk of death to a woman in childbirth is ten times as high as the risk of death to a woman in an induced abortion.

47. Looking at mortality rates for women, a "D & E" procedure or an induction procedure is much safer than either a hysterotomy or a hysterectomy.

48. Induction procedures are usually performed in hospital settings.

49. Dr. Henshaw has determined that there are three hospitals in Arizona which perform abortions, and that those hospitals are in Tucson and Phoenix.

50. Dr. Henshaw is not aware of any data existing on how many "D & E" procedures are performed where the fetus is extracted intact.

### Dr. Frederic Stimmell

51. Dr. Stimmell is a board certified obstetrician/gynecologist. As director of PPCNA, Dr. Stimmell performs abortions up to sixteen weeks LMP.

52. The term "partial birth abortion" is not a medical term. Dr. Stimmell believes that, as defined under the Act, the term "partial birth abortion" could include various types of second-trimester abortions, including the "D & E" procedure and the induction procedure.

53. Often during a "D & E" procedure, a part of the fetus protrudes from or is pulled through the cervical os with forceps before the fetus is fully removed. Sometimes the fetus is intact when this happens. and other times it is disjointed. The fetal heartbeat may or may not be beating when this occurs. When beginning a "D & E" procedure, it is impossible to predict the presentation of the fetus, or whether the fetus will be extracted intact or disjointed.

54. Dr. Stimmell believes that he will be at risk for criminal prosecution and civil liability when performing second-trimester abortions if the Act goes into effect.

### C. *Defendants' Witnesses.*

### Dr. Anthony Levatino

55. Dr. Levatino is an obstetrician/gynecologist who performed abortions from 1977 through 1985. Dr. Levatino is also is licensed attorney.

56. Dr. Levatino defines a "partial birth abortion" as a type of intact abortion which is performed beyond the stages at which a D & E would be traditionally performed or regarded to be safe. Dr. Levatino understands the "partial birth abortion" procedure to be that type of procedure described by a Dr. Haskell whereby the cervix is extremely dilated over a three day period. Instruments are then introduced into the uterine cavity which grasp the lower extremities of the fetus which are drawn through the cervix and into the vaginal canal. The skull of the fetus is then pierced and the cranial contents are removed via suction so that decompression of the head can be accomplished in order to deliver the head through the cervix.

57. In Dr. Levatino's knowledge, Dr. Haskell has not named this procedure "partial birth abortion"; rather, the intact "D & E" procedure described above is known as a form of a dilation and extraction ("D & X") abortion.

58. It is Dr. Levatino's understanding that "partial birth abortion" as described above is a procedure which is *not* done before 22 or 24 weeks LMP.

59. Dr. Levatino objects to the use of the "partial birth abortion" procedure as described above because it may be used to accomplish abortions on viable fetuses in healthy women.

### Dr. Stephen Calvin

60. Dr. Calvin is a board certified physician in obstetrics and gynecology and specializes in the area of maternal fetal medicine.

61. Dr. Calvin has seen a fetus survive at 22 1/2 weeks LMP.

### D. The Act.

62. The Act provides that a person who knowingly performs a partial-birth abortion and who kills a human fetus is guilty of a class 6 felony. *See* Ariz.Rev.Stat.Ann. § 13–3603.01(E)(1).

63. "Partial birth abortion" is defined as "an abortion in which the person performing the abortion partially vaginally delivers a living fetus before killing the fetus and completing the delivery." *See* Ariz.Rev.Stat.Ann. § 13–3603.01(E)(1). "Living fetus" is not defined in the Act.

64. The Act provides an exception where a "partial-birth abortion" is necessary to "save the life of the mother whose life is endangered by a physical disorder, illness or injury if no other medical procedure would save the mother's life." *See* Ariz.Rev.Stat. Ann. § 13–3603.01(B). The Act does not provide an exception where such a procedure may be necessary or helpful for the health of the mother.

65. The statute also contains provisions subjecting a person who performs a partial birth abortion to civil suit from the father of the fetus if the woman is married, or the maternal grandparents of the fetus if the woman is less than 18 years of age at the time of the abortion. *See* Ariz.Rev.Stat.Ann. § 13–3603.01(C).

### E. Abortion Procedures.

66. In the first-trimester of a pregnancy, the overwhelmingly number of abortions are accomplished through the suction curettage method.

67. In the second trimester of pregnancy, defined as post-thirteen weeks LMP, the majority of abortions are accomplished through a procedure known as Dilation and Evacuation ("D & E"). In the second-trimester, abortions may also be accomplished though the induction procedure. The induction method is not as commonly used by as the "D & E" procedure.

68. It is also possible to accomplish an abortion in the second-trimester by performing a hysterotomy. A hysterotomy is an operation whereby an incision is made through a woman's stomach and into her uterus and the fetus is removed. This is similar to what is sometimes done in a Caesarian section with a viable fetus. A hysterotomy is rarely, if ever, used for abortion purposes.

69. A "D & E" abortion is begun by dilating a woman's cervix overnight, and then extracting the fetal tissue when the cervix is sufficiently dilated. The fetal tissue may be extracted in a dismembered fashion, or the entire fetus may be extracted intact, up until the head.

70. A physician who begins a "D & E" procedure cannot predict at the start of the procedure whether the fetus will be extracted in a dismembered fashion, or if the fetus will be extracted intact.

71. If, during the "D & E" procedure, the fetus is extracted intact, then it is often necessary to collapse the skull in order to remove it from the uterus by allowing it to pass through the cervical os.

72. Where the fetus is extracted intact up until the point of the skull, some physicians refer to the procedure as a "Dilation and Extraction" or a "D & X", as opposed to a "D & E."

73. The induction procedure involves the use of chemicals to cause a woman to go into premature labor and pass the fetus. Although not as common as in the "D & E", it is sometimes necessary to collapse the fetal skull during the induction procedure so that the fetal skull may be removed from the uterus.

74. The term "partial birth abortion" is not a medical term which is used in the field of obstetrics/gynecology.

75. The only types of safe, medically acceptable abortion methods in the second-trimester which are available today are the "D & E" (or "D & X"), the induction, and the hysterotomy.

76. An induction is performed in a hospital while a "D & E" may be performed in a clinic. The only hospitals which perform abortions in Arizona are in Phoenix and Tucson.

77. While performing an abortion, the time of fetal death is not monitored.

### F. Pregnancy and Childbirth.

78. A full term pregnancy is approximately forty weeks LMP.

79. The first-trimester of pregnancy ends at approximately thirteen weeks LMP.

80. The second-trimester of pregnancy ends at approximately twenty-six weeks LMP.

81. Fetal viability is generally accepted to be at twenty-four weeks. Fetuses have been known to survive at less than twenty-four weeks.

82. The cervical os is the opening of the cervix, which is the entrance to the uterus.

Any conclusion of law set forth below which is deemed to be a finding of fact shall be incorporated herein.

### IV. Conclusions of Law.

Based upon the above findings of fact, the Court makes the following conclusions of law.

Any finding of fact set forth above which is deemed to be a conclusion of law shall be incorporated herein.

### A. Jurisdiction, Ripeness, Standing.

■ This Court has federal question jurisdiction under 28 U.S.C. § 1331 because the Plaintiffs facially attack the constitutionality of a state statute, A.R.S. § 13–3603.01. In addition, this case is ripe for review since at least part of the class of Defendants has expressed the intention to prosecute under the statute.[1]

■ Considering the question of standing, the Plaintiffs, as providers of abortion services, have standing to raise their claim both in their own right and on behalf of their patients. *See Planned Parenthood v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); *City of Akron v. Akron Center for Reproductive Health,* 462 U.S. 416, 440 n. 30, 103 S.Ct. 2481, 2498 n. 30, 76 L.Ed.2d 687 (1983); *Women's Medical Prof. Corp. v. Voinovich,* 911 F.Supp. 1051, 1058 (S.D.Ohio). The Plaintiffs' standing results from the Court's finding: 1) that there is a unique fiduciary-like relationship between doctor and patient, and 2) that the pregnant women have significant obstacles to bringing suit on their own behalf, such as a desire for privacy and the likelihood that their claims would be mooted by the time-sensitive nature of pregnancy and abortion. *See id.*

### B. Constitutionality of the Act.

**1. Does the Act Unconstitutionally Burden a Woman's Right to Abort a Nonviable Fetus?**

■ The Plaintiffs claim that the Act unconstitutionally bans abortions after the first-trimester because the Act could be interpreted to include all safe, commonly used methods of second-trimester abortions.[2] Thus, they argue that the effect of the Act would

---

**1.** The Yuma County Attorney responded to the Plaintiffs' Application for a Temporary Restraining Order and Preliminary Injunction by stating that the Yuma County Attorney's Office would enforce the Act.

**2.** The Plaintiffs argue that the Act could be interpreted to reach both the "D & E" procedure and the induction procedure, which are used in the overwhelmingly majority of second-trimester abortions. The Plaintiffs admit that the Act would not apply to a hysterotomy or to a hysterectomy which was performed for abortion purposes.

be to prevent women from obtaining second-trimester abortions.

The Defendants argue that the Act is not an unconstitutional burden on a woman's right to abort a nonviable fetus because the Act does *not* regulate abortion. Rather, the Defendants argue that the Act regulates the "process of birth". The Defendants acknowledge a woman's right to terminate a pregnancy in utero, but argue that the right to terminate even a nonviable fetus ends when that fetus is alive when the "birthing process" is begun. The Defendants define the beginning of the "birthing process" and the end of a woman's right to terminate a pregnancy as the point at which any portion of the fetus passes through the cervical os. The Defendants argue that abortion contemplates intrauterine death. Where physician terminates a fetus when at least part of it is extrauterine, then the Defendants argue that the physician has committed infanticide. In the view of the Defendants, the purpose of the Act is to "erect a firm barrier against infanticide."

The Defendants admit that there is no case law which supports the distinction between "abortion of a nonviable fetus" and "prematurely causing the birth of a nonviable fetus." Given the testimony heard by this Court, as described in the findings of fact set forth above, there is no distinction. Furthermore, the effect of creating such a distinction would be to unnecessarily burden a woman's right to terminate a nonviable fetus. Thus, this Court cannot adopt the Defendants' reasoning.

The conclusion that the Act unconstitutionally burdens a woman's right to abort a nonviable fetus draws strongly on the United States Supreme Court's decision in *Planned Parenthood v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). In *Casey*, the Supreme Court re-affirmed the basic holding of *Roe v. Wade* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and set forth several important points for courts to consider in assessing the constitutionality of laws regulating abortion. Among those points are the following:

1. A state may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability. *See Casey*, 505 U.S. at 879, 112 S.Ct. at 2821–22. Specifically, states may not enact regulations which have "the purpose and effect of placing a substantial obstacle in the path of a woman seeking an abortion." *Id.* Such regulations are an "undue burden" on a woman's right to abort a nonviable fetus.

2. A state is may not interfere with a woman's choice to undergo an abortion procedure if continuing her pregnancy would constitute a threat to her health. *See id.* at 880, 112 S.Ct. at 2822.

3. After viability, a state "may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Id.* at 879, 112 S.Ct. at 2821, *citing Roe v. Wade*, 410 U.S. 113, 164–65, 93 S.Ct. 705, 732, 35 L.Ed.2d 147 (1973).

The Court finds that the Act runs counter to each of the above three points. Regarding the first point, the credible testimony presented to this Court was that a physician conducting a "D & E" procedure cannot predict whether part of the fetus may protrude through the cervical os. Furthermore, the physician cannot predict the time of fetal death. Therefore, a physician cannot predict whether fetal death will occur intrauterine, or whether fetal death will occur after part of the fetus has passed through the cervical os.

The expert physicians who presented their testimony to this Court also expressed concern that the Act may apply to the induction procedure. The point of fetal death in the induction procedure is not known and cannot be predicted. Thus, fetal death may occur intrauterine, or it may occur after part of the fetus passes through the cervical os.

The testimony presented to this Court was that, if this Act were to go into effect, physicians would fear prosecution and civil liability when performing any "D & E" or induction due to the unpredictable nature of how the fetus presents itself and when fetal death will occur. Today, almost all second-trimester abortions are accomplished through either the "D & E" or the induction methods. Due to the threat of criminal and civil liability which the Act presents, physicians testified to this Court that they would stop perform-

ing "D & E" procedures and induction procedures if the Act were to go into effect. Thus, the likely result if the Act were to go into effect would be that "D & E" procedures and induction procedures may not be available for women seeking second-trimester abortions. The only alternative for a second-trimester abortion is a hysterotomy. A hysterotomy is an operation requiring hospitalization which is similar to a Caesarian section in a viable fetus. The morbidity rate for hysterotomies is much higher than for "D & E" procedures or induction procedures. In light of these facts, Court must conclude that the Act imposes an undue burden on a woman's right to terminate a nonviable fetus.

Considering the second and third of the above three points from *Casey,* even if the Act was interpreted as to *not* include all "D & E's" and induction procedures, the Act would still be unconstitutional because it fails to provide an exception from banned procedures where such a procedure is necessary for a woman's health. *Casey* is clear that a state is may not interfere with a woman's choice to undergo an abortion procedure if continuing her pregnancy would constitute a threat to her *health. See Casey.,* 505 U.S. at 880, 112 S.Ct. at 2821–22. The Act merely provides that the banned procedure may only be used to save the life of a woman. The response of the Defendants is that a "health exception" is not necessary if a statute does not create a substantial obstacle for a woman seeking to terminate a nonviable fetus. As explained above, the Act does impose an undue burden because it may prohibit the methods used in almost every second-trimester abortion. In addition, *Casey* is clear that a state may not interfere in a woman's choice to undergo an abortion procedure if it is necessary for her *health. See Casey,* 505 U.S. at 880, 112 S.Ct. at 2821–22. *Casey* even provides that *after* viability a state may not prevent abortion where it is necessary for the preservation of the *health* of the mother. *See id.* at 879, 112 S.Ct. at 2821–22. Thus, the fact that the Act does not provide an exception where the proscribed conduct is in the best interest of the health of a woman is an additional reason to find that the Act is unconstitutional.

## 2. Is the Act Unconstitutionally Vague?

 A law is void for vagueness in violation of due process where "persons of common intelligence must necessarily guess at meaning and differ as to application." *Smith v. Goguen,* 415 U.S. 566, 573, n. 8, 94 S.Ct. 1242 n. 8, 1247, 39 L.Ed.2d 605 (citations omitted). Due process requires that laws provide persons subject to regulation with "a reasonable opportunity to know what [conduct] is prohibited, so that [they] may act accordingly." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972); *Women's Medical Professional Corp. v. Voinovich,* 911 F.Supp. 1051, 1063 (S.D.Ohio 1995). Due process requires that a law must be sufficiently defined "to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." *Colautti v. Franklin,* 439 U.S. 379, 390, 99 S.Ct. 675, 683, 58 L.Ed.2d 596 (1979); *see also Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). The Court also notes that where "a statute imposes criminal penalties, the standard of certainty [that due process requires] is higher." *Kolender,* 461 U.S. at 358, n. 8, 103 S.Ct. at 1859 n. 8. Finally, the standard of certainty is particularly strict "where the uncertainty induced by the statute threatens to inhibit the exercise of constitutionally protected rights." *Colautti,* 99 S.Ct. at 683, 439 U.S. at 391.

 Against this backdrop of the requirements of due process, this Court considers the terms utilized in the Act. We begin with the term "partial birth abortion", which is defined as "partially vaginally delivering a fetus before killing the fetus." The term "partial birth abortion" is not a term found in the medical literature. The testimony of the witnesses at trial indicates that this term is ambiguous and susceptible to different interpretations. A vaginal delivery could include both a "D & E" procedure and an induction procedure in the second-trimester of pregnancy. Dr. Bettigole, Dr. Meyer, and Dr. Darney, who were witnesses for the Plaintiffs, all testified that they did not know if the statute only applied to the delivery of an intact fetus, or if it applied to a dismembered fetus. For instance, does the phrase "par-

tially vaginally delivers a fetus" mean to bring out a part of a disarticulated fetus from the uterus? Alternatively, does this mean to partially bring out an intact fetus?

There was some reference in the testimony of Dr. Levatino, a defense witness presented through deposition testimony, that the Act seeks to ban a particular type of abortion. Dr. Levatino testified that the definition of "partial birth abortion" in the Act refers to a late second-trimester abortion accomplished through a method advanced by a Dr. Haskell. Dr. Levatino testified that this is also known as a "D & X" abortion. A "D & X" abortion occurs where the fetus is delivered intact and then a particular surgical maneuver is utilized to decompress the skull in order to remove it from the uterine cavity.

The definition of "partial birth abortion" which is included in the Act is not limited to the situation described by Dr. Levatino. The Act does not limit "partial birth abortion" to an "intact" delivery. The Act is also not limited to late second-trimester abortions[3] Thus, the physicians who testified could reasonably interpret the Act to include a wider range of abortion procedures than that described by Dr. Levatino.

The Defendants admit that the term "partial birth abortion" is not used in any medical text or treatise. They argue that it is a "legal term of art" and that it "describes at least one medical procedure" ... sometimes referred to as a "D & X." The Defendants further define "partial birth abortion" as an intact delivery where the fetus is alive when at least part of it passes through the cervical os. The interpretation of at least some of the County Attorneys in Arizona is that the Act would not apply where the fetus was not alive when at least part if it passed through the cervical os. These County Attorneys claim that the Act *only* prohibits a procedure where there is: 1) a deliberate dilation of the maternal cervix, 2) rupture of the protective membranes, 3) passage of any part of a live intact fetus beyond the cervical os, and 4) termination of life.

In making its decision, the Court, as it is required to do, has certainly taken into consideration the interpretation of the prosecuting attorneys. *See Forsyth County. Georgia v. The Nationalist Movement,* 505 U.S. 123, 131, 112 S.Ct. 2395, 2401–02, 120 L.Ed.2d 101 (1992). However, the interpretation of the County Attorneys does not solve the problem that the term "partial birth abortion", without a sufficient description, can reasonably be interpreted differently by people of common intelligence. While the Act does not contradict the Defendants' interpretation, the language of the Act is sufficiently ambiguous as to include many interpretations other than that advanced by the Defendants. Thus, the Court concludes that the term "partial birth abortion" is defined in such a way that a "persons of common intelligence would necessarily guess at meaning and differ as to application." *See Goguen,* 415 U.S. at 573, 94 S.Ct. at 1247.

Considering other terms utilized in the Act, the Court notes that the Act does not define "living fetus". Does "living fetus" under the Act refer to the presence of a fetal heartbeat? Alternatively, does "living fetus" refer to living cells? As demonstrated by the testimony in this case, reasonable physicians differ as to the meaning of what is "living". In addition, the Act does not define when fetal death occurs.

An examination of the operable terms in the Act in light of the testimony presented to the Court shows that "a person of ordinary intelligence" does not have "fair notice that his contemplated conduct is forbidden by the statute." *Colautti,* 439 U.S. at 390, 99 S.Ct. at 683. Physicians performing abortions are not given fair warning under the statute "as to what conduct is permitted, and as to what conduct will expose them to criminal and civil liability." *Voinovich,* 911 F.Supp. at 1067. Thus, the Court concludes that the language of the Act is unconstitutionally vague and must be found to be void for vagueness.

---

**3.** The Court does not mean to imply that the Act would be constitutional if it more specifically defined "partial birth abortion" or if it was limited to late term second-trimester abortions. If the Act was so amended, it would still have to pass constitutional muster under the litany of cases which describe the constitutional limits of a woman's right to choose abortion.

### 3) Does the Act create Impermissible Spousal and Parental Consent Mandates?

 Even if the Act was able to pass muster on its substantive application, the Act would still be unconstitutional as a result of its spousal and parental consent mandates. The Act exposes physicians to the risk of civil lawsuits if they fail to obtain consent for a "partial birth abortion" from the spouse of a woman seeking such an abortion, or the parent of such a woman if she is under eighteen.

In *Casey*, the Supreme Court stated that some women:

> may have very good reasons for not wishing to inform their husbands of their decision to obtain an abortion. Many have justifiable fears of physical abuse ... many may have a reasonable fear that notifying their husbands will provoke further instances of child abuse ... many fear devastating forms of psychological abuse from their husbands.

*Casey*, 505 U.S. at 893, 112 S.Ct. at 2828–29.

The Casey Court found that the spousal consent requirement was unconstitutional because it was likely to deter a significant number of women from obtaining abortions. *See id.* at 898, 112 S.Ct. at 2831. Here, although spousal "consent" is not required, a physician is exposed to civil liability for performing a proscribed act without obtaining such consent. Thus, this Court finds that, in practice, there is no distinction between a spousal consent provision and the civil liability portion of the Act. Under *Casey*, such a provision is unconstitutional.

Regarding the provision on civil liability from a minor's parents, the Court also finds that, in practice, there is no distinction between this provision and a parental consent provision. Courts have held that parental consent provisions for minors in abortion regulation are constitutional so long as those provisions provide a judicial bypass procedure as an alternative for a pregnant young woman. See *Casey*, 505 U.S. at 899, 112

S.Ct. at 2832 (citations omitted); *See also Planned Parenthood of Southern Arizona v. Neely*, 942 F.Supp. 1578, 1582 (D.Arizona 1996); *Planned Parenthood of Southern Arizona v. Neely*, 804 F.Supp. 1210, 1216–18 (D. Arizona 1992). Here, there is no judicial bypass procedure included in the Act. Therefore, in order to be constitutional, the Act must provide an alternative route to parental consent. Since the Act does not provide such an alternative, it is unconstitutional.[4]

### V. *Conclusion.*

As set forth above, this Court finds that the Act unconstitutionally burdens a woman's right to terminate a nonviable fetus, and that the Act is void for vagueness in that it does not sufficiently define the conduct which it attempts to proscribe. In addition, the Court finds that the Act creates impermissible spousal and parental consent mandates.

**ACCORDINGLY,** it is the judgment of this Court that the Act is unconstitutional and the Act is **PRELIMINARILY AND PERMANENTLY ENJOINED** from taking effect. Judgment shall be issued in favor of the Plaintiffs and against the Defendants.

Attorneys fees and costs will be awarded to the Plaintiffs pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 1920. The Plaintiffs are instructed to file their Application for Attorneys Fees with the Court by **November 19, 1997.** The Defendants may file a response to the Application for Attorneys Fees by **December 17, 1997.** The Plaintiffs may file a reply by **January 2, 1998.**

The Plaintiffs are instructed to file their Application for Costs with the Clerk of the Court simultaneously with the above briefing schedule.

---

4. In *Casey,* the Supreme Court approved of the constitutionality of a judicial bypass procedure as an alternative to obtaining parental consent. In the case at hand, judicial bypass may not be appropriate because the conduct for which judicial approval may be sought is criminal as defined under the Act. The Court need not resolve this issue at this time since the Act does not provide for *any* alternative procedure for parental consent.