### PLANNED PARENTHOOD OF GREATER IOWA, INC. et al., Plaintiffs,

v.

### Thomas MILLER, Attorney General of the State of Iowa, in his official capacity, Defendant.

### Jennifer Niebyl, M.D. et al., Plaintiffs,

v.

### Thomas Miller, Attorney General of the State of Iowa, in his official capacity, Defendant.

### No. 4–98–CV–90149.

United States District Court, S.D. Iowa, Central Division.

Dec. 21, 1998.

Mark Lambert, Des Moines, IA, Dara Kassell, Eve C. Gartner, Roger K. Evans, New York City, for Planned Parenthood of Greater Iowa.

Bruce D. Nestor, Iowa City, IA, Janet Benshoof, Priscilla Smith, Julie F. Kowitz, New York City, for Jennifer Niebyl, M.D.

Mark Hunacek, Asst. Atty. Gen., Gordon E. Allen, Deputy Atty. Gen., Des Moines, IA, for Thomas Miller.

## MEMORANDUM OPINION AND ORDER GRANTING SUMMARY JUDGMENT

PRATT, District Judge.

Plaintiffs, Planned Parenthood of Greater Iowa and several physicians, bring this action against Defendant, the Attorney General of the State of Iowa, in his official capacity, pursuant to 42 U.S.C. § 1983. Plaintiffs ask this Court to enter summary judgment against Defendant and permanently enjoin Iowa's "Partial–Birth Abortion Ban" Act, 1998 Iowa Senate File 2073 (to be codified at Iowa Code § 707.8A). The "Partial–Birth Abortion Ban" Act ("the Act") imposes criminal and civil penalties against individuals who perform "partial-birth abortions." Plaintiffs challenge the constitutionality of the Act on the grounds that it is void for vagueness under the Fourteenth Amendment, violates their right to privacy under the Fourteenth Amendment, and violates university faculty's right to academic freedom under the First Amendment. This Court, having previously granted Plaintiffs' request for preliminary injunction, now grants Plaintiffs' request for summary judgment and permanent injunction for the reasons set forth below.

## I. Background

The Constitution of the United States provides the framework for American government and is the highest law of the land. *See Marbury v. Madison,* 5 U.S.(1 Cranch) 137, 177–78, 2 L.Ed. 60 (1803); *see generally* David P. Currie, *The Constitution of the United States: A Primer for the People* (1988). All government officers, including judges, have sworn to uphold it. *See* U.S. Const. art. VI, cl. 3. And while citizens elect representatives to the legislature at the state and federal level to enact laws that reflect the public's opinions on various issues, just because a law is enacted by the majority, it is not stamped with *constitutional* legitimacy. "In the United States the Constitution governs the legislator as much as the private citizen: as it is the first of laws, it cannot be modified by a law; and it is therefore just that the tribunals should obey the Constitution in preference to any law." Alexis de Tocqueville, 1 *Democracy in America* 105 (Phillips Bradley ed., Vintage Books 1945) (1835). It is the role of courts, among other duties, to ensure that legislative enactments do not infringe on activity which is constitutionally protected.[1]

■ The debate surrounding abortion laws is particularly charged; competing and often antithetical religious, moral, and political views are implicated. However, courts are not tribunals in which issues are decided based on the judge's individual religious, moral, or political beliefs.[2] That is not to say that the law as written by legislatures, or even as interpreted by previous courts, is

without religious, moral, or political grounds, but rather to emphasize that the federal district court, as an "inferior court"[3] and non-partisan entity, has a duty to decide individual cases and controversies based on the United States Constitution and the rulings of the United States Supreme Court.

The Constitution itself does not speak of abortion or the right to privacy. "Constitutions should consist only of general provisions: the reason is that they must necessarily be permanent, and they cannot calculate for the possible change of things." Alexander Hamilton, Speech at the New York Ratification Convention (June 28, 1788), *in 2 The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 364 (J. Elliot ed.1941), *quoted by* Philip A. Hamburger, *The Constitution's Accommodation of Social Change,* 88 U.Mich.L.Rev. 239, 327 n. 191 (1989). When the Constitution is silent as to an issue, courts look to the rulings of the Supreme Court for guidance. The Supreme Court interprets the constitutionality of laws, that is, defines the scope of constitutionally protected activities, in areas from speech to commerce to abortion.[4] Whether one agrees with the law as set forth by the Supreme Court or not, it is still the law of the land, and this Court, like all courts, is bound to follow its precedent.

## II. Legal Standard

The precise standard for granting summary judgment is well-established and oft-repeated: summary judgment is properly granted when the record, viewed in the light

---

**1.** If an act of the legislature, repugnant to the [C]onstitution, is void, does it, notwithstanding its invalidity, bind the courts and oblige them to give it effect? ... This would be to overthrow in fact what was established in theory; and would seem ... an absurdity too gross to be insisted on. *Marbury v. Madison,* 5 U.S.(1 Cranch) 137, 177, 2 L.Ed. 60 (1803).

**2.** This Court received a telephone message from a concerned citizen urging a ruling in accordance with the judge's conscience. This heartfelt plea misunderstands the judicial role. "It should go without saying that in deciding these questions ... we must, so far as it is humanly possible to do, lay to one side whatever personal reservations any of us may have either about abortion in general or about the decisions in which the Supreme Court has interpreted the Constitution as creating a right to abortion."

*Planned Parenthood v. Doyle,* 162 F.3d 463, 466 (7th Cir.1998) (Posner, J.).

**3.** Courts under the Supreme Court are called "inferior courts" and are established by Congress under the Constitution. *See* U.S. Const. art. III, § 1.

**4.** It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule.... So if a law be in opposition to the [C]onstitution ... the court must determine which of these conflicting rules governs the case. This is of the very essence of judicial duty.

*Marbury v. Madison,* 5 U.S.(1 Cranch) 137, 177–78, 2 L.Ed. 60 (1803).

most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir.1994). The Court does not weigh the evidence nor make credibility determinations, rather the court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is genuine issue for trial. *See* Fed.R.Civ.P. 56(c), (e); *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505.

### III. Facts

The following uncontested facts about abortion practices, the parties, and the Act are taken from the submissions of the parties.

### A. Abortion Practices

For abortions through approximately thirteen weeks of pregnancy as measured from the first day of the woman's last menstrual period, physicians rely almost entirely on a procedure called vacuum aspiration or suction curettage. In this procedure, the physician dilates the cervix, increasing the circumference of its opening. The physician then inserts a thin tube through the vagina, through the cervix, and into the uterus. By means of suction, the physician removes the embryo or fetus and the other products of conception. Sometimes a physician performing suction curettage must use forceps to remove the fetus or parts of the fetus. In

addition, sometimes a physician must make multiple passes through the uterus with the suction cannula before it is empty. If the physician has only removed part of the fetus from the uterus, the part remaining in the uterus may have a heartbeat.

After approximately thirteen weeks of pregnancy, when physicians can no longer rely exclusively on suction to evacuate the uterus, in the vast majority of cases they use a procedure termed dilation and evacuation ("D & E"). D & Es account for approximately ninety-six percent of post-first trimester abortions in Iowa and throughout the nation. In a D & E, the physician starts by dilating the cervix with mechanical or osmotic dilators, such as laminaria. (Osmotic dilators are small cylindrical sticks that gradually absorb fluid from the cervix and expand, typically over several hours or overnight.) When the cervix is sufficiently dilated, the physician removes the dilators, and ruptures the membranes—unless they are already ruptured—and removes the fetus and other products of pregnancy using a combination of forceps, curettage, and suction. The fetal skull is often too large to pass through the cervix whole, and the physician compresses it using forceps or by creating a small opening at the base of the skull and evacuating the contents with suction. Usually, the physician removes the fetus in parts, but can sometimes remove it largely intact. Sometimes after the physician ruptures the membranes, part of the fetus spontaneously protrudes through the cervical os and into the vagina while it still has a heartbeat. In addition, after the physician has brought part of the fetus into the vaginal canal with forceps (whether intact or disarticulated), the part remaining in the uterus may still have a heartbeat.

In order to minimize uterine or cervical perforation caused by fetal parts or by medical instruments, some physicians use a variant of D & E that involves intact, breech extraction of the fetus, a procedure which is sometimes called "dilation and extraction" ("D & X"). After dilating the cervix, the physician extracts the fetal body feet first up to the head, creates a small opening at the base of the fetal skull and evacuates the contents, thus collapsing the skull and allowing it to pass through the cervical opening.

The only other safe, routinely performed abortion procedure available after approximately fifteen weeks of pregnancy is induction abortion. . Induction abortion accounts for approximately four percent of post-first-trimester terminations nationwide. In induction abortions, the physician essentially induces pre-term labor by introducing one of several chemicals into the amniotic sac, the vagina, a vein, or a muscle. Inductions involve the same physiological and emotional stress and medical complications as labor and delivery at term. Some women have conditions that are relative or absolute contraindications for induction abortions, including cardiac ailments and previous uterine surgeries. Induction abortions are only performed in Iowa in a hospital setting, which makes them less available and more expensive than procedures that take place in a clinic or office setting. If during induction the fetus emerges feet first and the head lodges in the cervix, the physician will generally compress the skull to complete the delivery.

Physicians can also terminate pregnancy by performing a hysterectomy or hysterotomy, both of which entail abdominal surgery. These procedures, however, are rarely used as abortion methods, in large part because their rates of maternal mortality and morbidity are several times greater than either variant of D & E or induction. Hysterotomy is essentially a pre-term cesarean section, except that it entails even more blood loss and other damage because the uterus is thicker than at term. The scar from a hysterotomy can rupture during any subsequent pregnancy, causing catastrophic bleeding, and a woman who has had a hysterotomy must deliver any future children by cesarean section to avoid rupturing the scar during labor. Hysterectomy, the removal of the uterus, leaves the woman permanently sterile. Both operations involve the risks concomitant with major surgery and require hospitalization.

### B. The Parties

Plaintiff Planned Parenthood of Greater Iowa is a non-profit corporation that operates clinics throughout Iowa. These clinics provide counseling, educational, and medical services, including abortion procedures through the end of the eighteenth week of pregnancy, such as suction curettage and dilation and evacuation procedures. Plaintiff Emma Goldman Clinic for Women is a non-profit corporation that operates a reproductive health care facility in Iowa City, Iowa that provides medical, counseling, and educational services, including abortion procedures through the end of the twelfth week of pregnancy. Plaintiffs Sue Haskell, Paula R. Mahone, Rebecca Shaw, Robert Kretschmar, Veronika E.B. Kolder, Jennifer Niebyl, Noelle·C. Bowdler, Sonya Erickson, Susan Johnson, Ann Laros, Ambre Olsen, and Ingrid Nygaard are physicians licensed to practice in Iowa who perform various abortion procedures. Plaintiffs Niebyl, Bowdler, Erickson, Johnson, Laros, Olsen, Nygaard, Joel I. Sorosky, Craig Syrop, and Bradley J. Van Voorhis are professors in the Department of Obstetrics and Gynecology at the University of Iowa, who teach and train medical students and residents in various·abortion procedures. Defendant Thomas Miller is the Attorney General for the State of Iowa and is responsible for enforcement of the Act. *See* Iowa Code § 13.2(1)–(3).

### C. The "Partial–Birth Abortion Ban" Act

The Act states, "[a] person shall not knowingly perform or attempt to perform a partial-birth abortion." 1998 Iowa Senate File 2073. Section 1(c) of the Act defines "partial-birth abortion" as "an abortion in which a person partially vaginally delivers a living fetus before killing the fetus and completing the delivery." Section 1(d) states that " '[v]aginally delivers a living fetus before killing the fetus' means deliberately and intentionally delivering into the vagina a living fetus or a substantial portion of a living fetus for the purpose of performing a procedure the person knows will kill the fetus, and then killing the fetus." The Act includes a single exception. · Section 2 relieves the physician of liability only when a "partial-birth abortion . . . is necessary to save the life of the mother whose life is endangered by a physical disorder, physical illness, or physical injury."

Violation of the Act is a Class C Felony under Iowa law. As a Class C felony, the penalty is a prison term for up to ten years and a fine from $500 to $10,000. In addition to the above listed criminal penalties, the Act also provides for civil lawsuits. Section 4 allows "the mother on whom a partial-birth

abortion is performed, the father of the fetus, or if the mother is less than eighteen years of age or unmarried at the time of the partial-birth abortion, a maternal grandparent of the fetus" to bring a civil action against anyone who allegedly performs a partial-birth abortion. The plaintiff may seek money damages for "all injuries, psychological and physical, resulting from" the partial-birth abortion.

Prior to passing the Act, the Iowa House of Representatives and Iowa Senate considered and rejected several amendments. Both chambers considered and rejected amendments to: (1) define "fetus" to mean a "human fetus that has achieved viability;" (2) define "partial-birth abortion" as the "intact dilation and extraction procedure;" (3) exclude from the definition of "partial-birth abortion" all "vacuum aspiration, suction aspiration, dilation and curettage, suction curettage, induction, [and] dilation and evacuation procedures;" (4) include an exception to the ban for "partial-birth abortions" that are "necessary to preserve the life or health of the woman;" and (5) limit the Act's civil cause of action to only the woman upon whom the procedure was performed. *See* State of Iowa Senate Journal, Thursday, February 5, 1998, 214–15 (rejecting amendments S–5021, S–5023, S–5024, S–5025); State of Iowa House Journal, Wednesday, February 18, 1998, 280–88 (rejecting Amendments H–8061, H–8062, H–8065). In addition, the Iowa Senate rejected an exception to the Act for abortions necessary to preserve the future fertility of the woman. *See* State of Iowa Senate Journal, Thursday, February 5, 1998, 214–15 (rejecting Amendment S–5022).

## IV. Analysis

Plaintiffs challenge the Act's constitutionality on the grounds that it is vague, violates their right to privacy, and violates university faculty's right to academic freedom. Before considering Plaintiffs' arguments, the Court must address the standing issue that Defendant briefly raises in his response to Plaintiffs' motion.

Standing is the constitutional requirement that a plaintiff must allege a judi-cially cognizable and redressable injury in order to pursue a lawsuit. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–60, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). To establish standing, a plaintiff must prove: "injury in fact" that is both concrete and particularized, and actual or imminent, rather than conjectural or hypothetical; a causal connection between the alleged injury and the defendant's conduct; and that it is likely that a favorable decision will redress the injury. *See id.* at 560–61, 112 S.Ct. 2130. The Supreme Court has clearly recognized the standing of physicians to challenge statutes that operate against them in the event they perform an abortion that does not meet statutory exceptions and conditions. *See Planned Parenthood v. Danforth*, 428 U.S. 52, 62, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976). This Court finds that Plaintiffs Planned Parenthood and the Emma Goldman Clinic also have standing as the owners of clinics at which abortions are performed and as the employers of physicians who perform abortions. *See Planned Parenthood v. Doyle*, 162 F.3d 463, 464 (7th Cir.1998) (Posner, J.) ("The standing of physician plaintiffs, and of Planned Parenthood as the owner of abortion clinics in Wisconsin, to maintain this suit is not open to question.") (citing *Danforth*, 428 U.S. at 62, 96 S.Ct. 2831; *Doe v. Bolton*, 410 U.S. 179, 188–90, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973)). Finally, this Court finds that Plaintiffs have third-party standing "to assert the rights of women patients as against governmental interference with the abortion decision." *Singleton v. Wulff*, 428 U.S. 106, 115–16, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976).

Defendant argues in his response that because Plaintiffs admit in their answers to Defendant's Interrogatory No. 1 that they have not performed the procedure prohibited by the Act in the last five years, there is no actual or imminent injury to them, and therefore they have no standing to challenge the Act. However, the language used to describe a "partial-birth abortion" in Defendant's Interrogatory No. 1[5] is not the same language

---

**5.** For purposes of this interrogatory, partial birth abortion is defined as:

The physician grasps, usually with forceps, an extremity of the living fetus, while in the uter-us, causing a reversion if necessary, and pulls the extremity into the vagina. The opposite extremity is then delivered into the vagina, then the torso, the shoulders and the upper

used to describe a "partial-birth abortion" in the Act.[6] Nor is it same language used by Defendant to describe "the procedure clearly prohibited by the Iowa statute"[7] in the very paragraph of his response in which he alleges Plaintiffs' lack of standing. Therefore, the Court finds Plaintiffs' Answers to Defendant's Interrogatory No. 1 meaningless. Plaintiffs have standing because they assert a sufficiently direct threat of personal detriment. Having determined that Plaintiffs have standing to bring this action, the Court turns to its analysis of Plaintiffs' three constitutional challenges to the Act.

## A. Vagueness

Plaintiffs argue that the Act is void for vagueness in violation of the Fourteenth Amendment's Due Process Clause because several of the definitions of the prohibited medical procedures are so unclear as to deprive physicians of fair notice of the prohibited behavior. Defendant responds that the Act clearly prohibits only one abortion procedure, the D & X. In its June 26, 1998 Order, this Court found, on the basis of the record and arguments before it at the preliminary injunction stage, that Plaintiffs would prevail on this issue if a final determination on the merits were required. After considering the record as a whole, including the additional arguments of both parties, oral and written, and the additional affidavits and declarations submitted by the parties, the Court finds the Act void for vagueness.

■■■■ "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

Due process demands that statutes give fair warning of the conduct that is prohibited. *Id.* Without warning as to the meaning of a statute, people will "steer far wider of the unlawful zone ... than if the boundaries of the forbidden areas were clearly marked." *Id.* at 109, 92 S.Ct. 2294 (quoting *Baggett v. Bullitt,* 377 U.S. 360, 372, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964)). A statute, therefore, is void for vagueness if people of "ordinary intelligence" are forced to guess at the meaning of the statute and differ as to its application. *See Grayned,* 408 U.S. at 108, 92 S.Ct. 2294; *Smith v. Goguen,* 415 U.S. 566, 574, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974).

■■■■ Perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 499, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); *Colautti v. Franklin,* 439 U.S. 379, 391, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979) (invalidating criminal abortion statute as impermissibly vague on its face). In addition, the level of certainty that due process requires is higher when a statute imposes criminal penalties. *Kolender v. Lawson,* 461 U.S. 352, 358 n. 8, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). Failure to satisfy the more stringent standard in cases where constitutional rights or criminal penalties are involved necessitates a finding that the law is unconstitutionally vague, even though the law could conceivably have some constitutional applications. *See Colautti,* 439 U.S. at 391, 99 S.Ct.

---

extremity. The skull lodges at the internal cervical os. The physician inserts scissors into the base of the skull or into the foramen magnum, and then spreads the scissors to enlarge the opening into the skull. Using a suction catheter, the physician then evacuates the contents of the skull, and with the skull then deflated, applies traction to the fetus and removes it completely from the patient. Using this definition,
a) how many partial birth abortions have you personally performed in Iowa, in each of the last five years?
b) how many partial birth abortions have been performed by others at the facility at which you regularly practice?
*Pls.' Answers to Def.'s Interrogs.*

6. " 'Partial-birth abortion' means an abortion in which a person vaginally delivers a living fetus before killing the fetus and completing the delivery." 1998 Iowa Senate File 2073.

7. "The procedure clearly prohibited by the Iowa statute,[sic] involves the instrumental conversion of the fetus to a footling breech, extraction of the body excepting the head, and partial evacuation of the contents of the brain of a living fetus, to effect vaginal delivery of a dead but otherwise intact fetus." (Def.'s R. to Mot. for S.J. at 7.) This language copies almost exactly the language used by the American College of Obstetricians and Gynecologists to describe the elements of a D & X. *See* ACOG Statement on Intact Dilation and Extraction, January 12, 1997.

675; *Kolender*, 461 U.S. at 358 n. 8, 103 S.Ct. 1855.

■■■ The Act's prohibitions are not clearly defined and do not give fair warning of the scope of the prohibited conduct. The Act bans "partial-birth abortions." As noted above, the Act defines "partial-birth abortion" as "an abortion in which a person partially vaginally delivers a living fetus before killing the fetus and completing the delivery." 1998 Iowa Senate File 2073 § 1(c). The Act further defines "vaginally delivers a living fetus before killing the fetus" as "deliberately and intentionally delivering into the vagina a living fetus or a substantial portion of a living fetus for the purpose of performing a procedure the person knows will kill the fetus, and then killing the fetus." 1998 Iowa Senate File 2073 § 1(d). These definitions of the procedures prohibited under the Act and the undefined terms "partially vaginally delivers," "living fetus," and "substantial portion" are vague, forcing physicians to guess at the meaning of the Act.

The term "partial-birth abortion" is not a medically recognized term.[8] Physicians are, therefore, particularly dependent on the Act's wording to determine the scope of prohibited conduct. The record indicates considerable uncertainty within the medical community as to the meaning of the plain language of the Act. Plaintiffs, in several declarations, state that they are unfamiliar with any medical procedure known as a "partial-birth abortion," while Defendant submits five identical affidavits from physicians not licensed to practice in Iowa stating that they understand the term to cover only the D & X procedure.[9]

The undefined phrases "partially vaginally delivers," "living fetus," and "substantial portion" are ambiguous and open to interpretation. It is not clear whether a partial vaginal delivery means partially delivering an intact fetus or fully delivering part of a fetus. It is not clear whether "living fetus" refers only to an intact fetus with a heartbeat or some other form of "life," or to a disarticulated fetus with a heartbeat or some other sign of "life." The evidence before the Court indicates that "substantial portion" is also an ambiguous term, described alternately in percentages of the entire fetus or parts of the fetal body. And "deliver" is a medical term of art with very broad meaning in obstetrics. The fact that these terms are subject to varying interpretations is critical, because depending on the definitions used, the evidence before the Court shows that the Act can encompass within its scope of prohibited conduct all of the abortion procedures described in Section IIIA *supra*. For example, in performing a D & E or suction curettage, the physician may deliver a substantial portion of the fetus into the vagina before it is disarticulated, for the purpose of terminating the fetus, and then do so, thereby subjecting the doctor to the Act's penalties. Because physicians are forced to guess at the Act's meaning, they are likely to "steer far wider of the unlawful zone" than if the Act were more clear. This is particularly true in light of the Act's criminal penalties.

Defendant states that the Act bans only one specific abortion procedure: the D & X. Defendant states that D & E procedures are not prohibited by the wording of the statute because the statute contemplates the delivery of an intact fetus, or a substantial portion thereof, while a D & E involves the dismemberment of the fetus. As just noted, however, the record demonstrates that such dismemberment may result in delivery of a substantial portion of the fetus, and that sometimes a D & E procedure unintentionally results in the delivery of an intact fetus.

---

8. The fact that any number of bills with varying definitions of "partial-birth abortion" have been introduced into state legislatures throughout the country purporting to ban that procedure is also support for the idea that there is no single accepted and understood definition of the term.

9. However, in testimony given in challenges to other states' "partial-birth abortion" laws, some of Defendant's own affiants made contradictory statements about what constitutes a "substantial portion" of a fetus or which procedures are prohibited by a ban of "partial-birth abortions." Also, Plaintiffs have offered unrefuted evidence that Dr. Kathi Aultman, one of Defendant's affiants, has not performed an abortion since 1982 and is not current on the medical aspects of abortion. They likewise offered unrefuted evidence that Dr. Steve Calvin, another of Defendant's affiants, has performed only approximately ten to twelve abortions in his entire career.

**1166**

 Defendant further argues that the Act's requirements of knowledge and intent cure any problems of vagueness. Defendant claims that procedures such as D & E and suction curettage do not "typically" involve the scenarios indicated by Plaintiffs' descriptions, and if they inadvertently do in a particular case, then the scienter requirement removes any possibility of prosecution. That is, if a procedure that would otherwise come under the Act's ban occurs accidentally, the fact that it occurred unintentionally will save a physician from prosecution. However, under Iowa law,[10] there is a "presumption that a person intends the natural consequences of his intentional acts." *State v. Chatterson*, 259 N.W.2d 766, 770 (Iowa 1977); *State v. Graham*, 221 N.W.2d 258, 260 (Iowa 1974). Also, when the proscribed conduct is unconstitutionally vague, the statute cannot be saved by the existence of a scienter requirement. *See Screws v. United States*, 325 U.S. 91, 105, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945); *Garner v. White*, 726 F.2d 1274, 1282 n. 10 (8th Cir.1984). Therefore, the scienter requirement of the Act cannot save it from being void for vagueness.

 Defendant argues that if the Act is found to be ambiguous,[11] cannons of statutory construction direct the Court to examine the federal legislative history to determine the Iowa legislature's intent.[12] When interpreting ambiguous statutes, a court may consider the statute's legislative history and the applicable preamble or statement of policy. *See Holiday Inns Franchising, Inc. v. Branstad*, 537 N.W.2d 724, 728 (1995). Defendant, however, urges that this Court consider, not the scant Iowa legislative history, but the federal legislative history.

 The Iowa Supreme Court has stated that "[a]lthough decisions and interpretations of federal courts may be illustrative and instructive to state courts in construing statutes patterned after those enacted by Congress and entitled to great weight in determining construction to be given the same phrase in subsequently enacted state statutes, they are neither conclusive nor compulsory." *Hubbard v. Iowa*, 163 N.W.2d 904, 909 (Iowa 1969). The *Hubbard* court discusses the weight to be given to federal court decisions interpreting statutes enacted by Congress. In the case before us, Defendant urges us to apply not case law, but federal legislative history of an act that was not even passed by Congress. This Court is not persuaded that the Supreme Court of Iowa would consult such authority to interpret an Iowa statute, and that even if it did, that it would not be binding on that court.[13]

 The limited Iowa legislative history that does exist indicates that language that would have expressly limited the reach of Iowa's ban to the D & X procedure was specifically rejected by both chambers of the Iowa legislature. While this Court recognizes that when possible, statutes should be construed to avoid the danger of unconstitutionality, *see Planned Parenthood v. Ashcroft*, 462 U.S. 476, 493, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983), this Court finds that the Act is void for vagueness because it fails to define the conduct prohibited with the requisite degree of certainty, which is heightened in this case because exercise of the constitutionally protected right to abortion is threatened and criminal penalties are imposed. Even if the Act were found not to be void for vagueness, the Act violates Plaintiffs' constitutional right to privacy.

### B. Right to Privacy

 The Supreme Court has held that women have a constitutional right to privacy

10. The interpretation of the statute that is reviewed for constitutionality should include the interpretation that would be given by the Iowa Supreme Court. *See Grayned*, 408 U.S. at 111–12, 92 S.Ct. 2294.

11. "A statute is ambiguous if reasonable minds could differ or be uncertain as to the meaning of the statute." *Holiday Inns Franchising, Inc. v. Branstad*, 537 N.W.2d 724, 728 (1995).

12. Defendant claims that the Iowa law was modeled on the federal ban on "partial-birth abor-

tion" and that the legislative history to the federal act conclusively demonstrates that the ban in Iowa is meant to proscribe only the D & X procedure.

13. Defendant also directs the Court to a letter from Dr. John Redwine, state sponsor of the Act, as evidence of legislative intent. The letter is a letter to the editor of the Sioux City Journal and is not persuasive to this Court.

that is "broad enough to encompass a woman's decision whether or not to terminate her pregnancy." *Roe v. Wade*, 410 U.S. 113, 153, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Plaintiffs allege that the Act violates their right to privacy by: imposing an undue burden on a woman's abortion right; failing to provide adequate exceptions for when a banned procedure is in a woman's health interest and for when a banned procedure would best preserve a woman's life; banning virtually all safe pre-viability abortions; prohibiting the patient from choosing, in consultation with her physician, safe and accepted medical procedures; and imposing unconstitutional third-party consent requirements. The Court finds that the Act imposes an undue burden on a woman's right to abortion and fails to provide adequate health and life exceptions.

### (1) Undue Burden

In *Planned Parenthood v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), the Supreme Court affirmed the central holding of *Roe*, that a woman has a constitutional right to terminate her pregnancy before viability and the State may not prohibit any woman from making that ultimate decision. The plurality, however, rejected the *Roe* Court's trimester framework because it believed it undervalued the State's interest in life. The plurality in *Casey* drew the line at viability and recognized the State's interest in promoting life even in the earliest stages of pregnancy. The Court declared: "Only where state regulation imposes an undue burden on a woman's ability to make this decision does the power of the State reach into the heart of the liberty protected by the Due Process Clause." *Casey*, 505 U.S. at 874, 112 S.Ct. 2791. In the Court's view, "the undue burden standard is the appropriate means of reconciling the State's interest with the woman's constitutionally protected right." *Id.* at 876, 112 S.Ct. 2791. The Court clarified that a state regulation imposes an undue burden when it has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus. *Id.* at 877, 112 S.Ct. 2791. "A statute with this purpose is invalid because the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it." *Id.*

The undisputed evidence is that through thirteen weeks of pregnancy, physicians rely almost entirely on suction curettage. After approximately thirteen weeks of pregnancy, the vast majority of abortions are performed by D & E. After approximately fifteen weeks of pregnancy, the only safe, routinely performed procedure is induction. Plaintiffs argue that for the same reasons the Act is vague, its sweep is broad enough to encompass all pre-viability procedures listed in the above paragraph except for induction. This, Plaintiffs argue, is in direct contravention of *Casey*. On the basis of the complete record, the Court agrees. The Court clearly held in *Casey* that the State's interest in potential life "is *insufficient* to justify a ban on abortions prior to viability even when it is subject to certain exceptions." *Casey*, 505 U.S. at 871, 112 S.Ct. 2791 (emphasis added). The Act is, therefore, unconstitutional as a matter of law because it imposes an undue burden on women seeking abortions by denying them access to pre-viability abortions and prohibiting physicians from performing the most common, readily available, and safest post-viability procedures.

### (2) Inadequate Health and Life Exceptions

Plaintiffs claim that the Act also violates the right to privacy by failing to provide adequate exceptions to preserve a woman's life and health. Defendant claims that no exception for the health of the mother is necessary in order to preserve the constitutionality of the statute because alternative procedures are still available. "[T]he essential holding of *Roe* forbids a State to interfere with a woman's choice to undergo an abortion procedure if continuing her pregnancy would constitute a threat to her health." *Casey*, 505 U.S. at 879–80, 112 S.Ct. 2791. The Supreme Court clearly set out the requirements for exceptions to State abortion regulation in *Casey*, holding that after viability, a State may "regulate, and even proscribe, abortion *except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the moth-*

er." *Id.* at 879, 112 S.Ct. 2791 (emphasis added).[14]

▮▮▮ The Act's exception states only that the ban "shall not apply to a partial-birth abortion that is necessary to save the life of the mother whose life is endangered by a physical disorder, physical illness, or physical injury." 1998 Iowa Senate File 2073 § 2. The Act's language is constitutionally infirm. The language of the Act impermissibly narrows the standard set forth by the Supreme Court in *Casey* by making no exception for the preservation of *health*, by limiting the life exception to a situation where the woman's life is *physically* endangered, and by omitting the "necessary, in appropriate medical judgment" language from the standard for life and health exceptions.

By having absolutely no health exception, the Act would unconstitutionally preclude women with non-life threatening physical, or any mental, disorders from pursuing what might be the safest abortion for them. *See Thornburgh v. American College of Obstetricians & Gynecologists*, 476 U.S. 747, 768–69, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986) (holding abortion ban unconstitutional when it failed to require that maternal health be the physician's paramount concern), *overruled in part on other grounds by Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (cited in *Planned Parenthood v. Verniero*, No. 97–6170, 1998 WL 849763, *23 (D.N.J. Dec.8, 1998) ("Forcing a physician to wait until a pregnancy threatens a woman's life before resorting to a 'partial-birth abortion' would not only be bad medicine, but is directly contrary to the dictates of *Roe* and *Casey*.")). The Court finds that the Act violates Plaintiffs' right to privacy by failing to provide an adequate exception for the health and life of the mother in accordance with the dictates of *Casey*.

Because the Court finds the act violates Plaintiffs' right to privacy by imposing an undue burden on a woman's right to abortion and failing to provide adequate exceptions for when a banned procedure is necessary for the health or life of a woman, the Court finds no need to discuss Plaintiffs' other proffered reasons for the Act's violation of their right

to privacy. Additionally, because the Court has found the Act to be unconstitutional on both vagueness and privacy grounds, the Court will not address Plaintiffs' academic freedom argument.

### V. Conclusion

Having found no dispute of material fact, the Court finds as a matter of law that the Act is unconstitutional because it is void for vagueness and violates Plaintiffs' right to privacy. The Act violates Plaintiffs' right to privacy by imposing an undue burden on women seeking an abortion and by failing to provide an adequate health exception.

The following is **HEREBY ORDERED:**

Plaintiffs' request for summary judgment is **GRANTED.** The Iowa Partial–Birth Abortion Ban Act, 1998 Iowa Senate File 2073, to be codified at Iowa Code § 707.8A, is declared unconstitutional, and Plaintiffs' request for a permanent injunction is **GRANTED.** Defendant is permanently enjoined from enforcing any provision of the Iowa Partial–Birth Abortion Ban Act, Iowa Senate File 2073, to be codified at Iowa Code § 707.8A.

---

**14.** As Plaintiffs indicate, if health and life exceptions are required post-viability, they are surely required pre-viability, when the State's interest in potential life is not compelling.