**PLANNED PARENTHOOD OF GREATER IOWA, INC., et al., Plaintiffs,**

v.

**Thomas MILLER, Attorney General of the State of Iowa, in his official capacity, Defendant.**

**Jennifer NIEBYL, M.D., et al., Plaintiffs,**

v.

**Thomas MILLER, Attorney General of the State of Iowa,in his official capacity, Defendant.**

**No. CIV. 4–98–CV–90149.**

United States District Court, S.D. Iowa, Central Division.

June 26, 1998.

Mark Lambert, Des Moines, IA, Dara Kassell, Eve C. Gartner, Roger k. Evans, New York City, for Planned Parenthood of Greater Iowa.

Bruce D. Nestor, Iowa City, IA, Janet Benshoof, Priscilla Smith, Julie F. Kowitz, New York City, for Jennifer Niebyl, M.D.

Mark Hunacek, Asst. Atty. Gen., Gordon E. Allen, Deputy Atty. Gen., Des Moines, IA, for Defendants.

## MEMORANDUM OPINION AND ORDER ON MOTION FOR PRELIMINARY INJUNCTION

PRATT, District Judge.

Plaintiffs request this court to preliminarily enjoin Iowa Code § 707.8A. This section bans "partial-birth" abortion and is scheduled to take effect July 1, 1998. The court grants plaintiffs' motion and enjoins Section 707.8A until final resolution of this case on the merits.

The court notes for the record, and at the outset, the extraordinary nature of a request for injunctive relief. In essence, the court is asked to guess about the final resolution of the competing claims of the parties. The court does not take this task lightly.

The purpose of a preliminary injunction is to "prevent such a change in the relations and conditions of persons ... as may result in irremediable harm to some of the parties before their claims can be investigated and adjudicated." *Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109, 113 n. 5 (8th Cir. 1981). The basic question the court must answer is "whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id.* at 113. In order to guide our inquiry, the Eighth Circuit Court of Appeals has listed four factors the court should consider: (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Id.* No single factor is determinative. *Id.*

Some background facts about various abortion procedures currently available, as well as the relevant legislative history of Section 707.8A, are clearly necessary before any discussion of the parties' claims.

## Background Facts

For abortions through approximately 13 weeks measured from the first day of the woman's last menstrual period (lmp), physicians rely almost entirely on a procedure called vacuum aspiration or suction curettage. In this procedure, the physician dilates the cervix, increasing the circumference of its opening. The physician then inserts a thin tube through the vagina, through the cervix, and into the uterus. By means of suction, the physician removes the embryo or fetus and the other products of conception. Sometimes a physician performing a vacuum aspiration procedure must use forceps to remove the fetus or parts of the fetus. In addition, sometimes a physician must make multiple passes through the uterus with the suction cannula before it is empty. In these circumstances, after the physician has removed part of the fetus from the uterus, the part remaining in the uterus may have a heartbeat.

After approximately 13 weeks of pregnancy lmp, when physicians can no longer rely exclusively on suction to evacuate the uterus, in the vast majority of cases physicians use dilation and evacuation (D & E). D & Es account for approximately 96% of post-first trimester abortions nationally. In a D & E, the physician starts by dilating the cervix with mechanical or osmotic dilators, such as laminaria. (Osmotic dilators are small cylindrical sticks that gradually absorb fluid from the cervix and expand, typically over several hours or overnight.) When the cervix is sufficiently dilated, the physician removes the dilators, and ruptures the membranes—unless they are already ruptured—and removes the fetus and other products of pregnancy using a combination of forceps, curettage, and suction. The calvarium (skull) is often too large to pass through the cervix whole, and the physician compresses it. Usually, the physician removes the fetus in parts, but can sometimes remove it largely intact. Sometimes after the physician ruptures the membranes, part of the fetus spontaneously prolapses through the cervical os and into the vagina while it still has a heartbeat. In addition, after the physician has brought part of the fetus into the vaginal canal with forceps (whether intact or disarticulated), the part remaining in the uterus may still have a heartbeat.

Some physicians use a variant of D & E that involves intact, breech extraction of the fetus, a procedure which is sometimes called "dilation and extraction" (D & X, as opposed to D & E). After dilating the cervix, the physician extracts the fetal body feet first up to the head; creates a small opening at the base of the fetal skull; and evacuates the contents, thus collapsing the skull and allowing it to pass through the cervical opening.

Other than D & E, the only safe, routinely performed procedure available after approximately 15 weeks is induction abortion. Induction abortion accounts for approximately 4% of post-first-trimester terminations nationwide. In induction abortions, the physician essentially induces pre-term labor by introducing one of several chemicals into the amniotic sac, the vagina, a vein, or a muscle. Inductions involve the same physiological stress, emotional trauma, and medical complications as labor and delivery at term. Some women have conditions that are relative or absolute contraindications for induction abortions, including cardiac ailments and previous uterine surgeries. Induction abortions are only performed in Iowa in a hospital setting, which makes them less available and more expensive than procedures that take place in a clinic or office setting. If during induction the fetus emerges feet first and the head lodges in the cervix, the physician will generally compress the skull to complete the delivery.

Physicians can also terminate pregnancy by performing a hysterectomy or hysterotomy, both of which entail abdominal surgery. These procedures, however, are rarely used as abortion methods, in large part because their rates of maternal mortality and morbidity are several times greater than either D & E or induction. Hysterotomy is essentially a pre-term cesarean section, except that it entails even more blood loss and other damage because the uterus is thicker than at term. The scar from a hysterotomy can rupture during any subsequent pregnancy, causing catastrophic bleeding, and a woman who has had a hysterotomy must deliver any future

children by cesarean section to avoid rupturing the scar during labor. Hysterectomy, the removal of the uterus, leaves the woman permanently sterile. Both operations involve the risks concomitant with major surgery and require hospitalization.

Section 707.8A, often referred to as the "Partial–Birth Abortion Ban" (hereinafter referred to as the Act), prohibits a person from "knowingly perform[ing] or attempt[ing] to perform a partial-birth abortion." 1998 Iowa Legis. Serv.2073 (West)(to be codified at Iowa Code § 707.8A). Section 1(c) of the Act defines "partial-birth abortion" as "an abortion in which a person partially vaginally delivers a living fetus before killing the fetus and completing the delivery." Section 1(d) states that " '[v]aginally delivers a living fetus before killing the fetus' means deliberately and intentionally delivering into the vagina a living fetus or a substantial portion of a living fetus for the purpose of performing a procedure the person knows will kill the fetus, and then killing the fetus."

The Act includes a single exception. Section 2 relieves the physician of liability only when a "partial-birth abortion ... is necessary to save the life of the mother whose life is endangered by a physical disorder, physical illness, or physical injury."

Violation of the Act is a Class C Felony under Iowa law. As a Class C felony, the penalty is a prison term for up to ten years and a fine from $500 to $10,000.

The Act also provides for civil lawsuits in addition to the above listed criminal penalties. Section 4 allows "the mother on whom a partial-birth abortion is performed, the father of the fetus, or if the mother is less than eighteen years of age or unmarried at the time of the partial-birth abortion, a maternal grandparent of the fetus" to bring a civil action against anyone who allegedly performs a partial-birth abortion. The plaintiff may seek money damages for "all injuries, psychological and physical, resulting from" the partial-birth abortion.

Prior to passing the Act, the Iowa House of Representatives and Iowa Senate considered and rejected several amendments. Both chambers considered and rejected amendments to (1) define "fetus" to mean a "human fetus that has achieved viability"; (2) define "partial-birth abortion" as the "intact dilation and extraction procedure"; (3) exclude from the definition of "partial-birth abortion" all "vacuum aspiration, suction aspiration, dilation and curettage, suction curettage, induction, [and] dilation and evacuation procedures"; (4) include an exception to the ban for "partial-birth abortions" that are "necessary to preserve the life or health of the woman"; and (5) limit the Act's civil cause of action to only the woman upon whom the procedure was performed. *See* State of Iowa Senate Journal, Thursday, February 5, 1998, 214–15 (rejecting amendments S–5021, S–5023, S–5024, S–5025); State of Iowa House Journal, Wednesday, February 18, 1998, 280–88 (rejecting Amendments H–8061, H–8062, H–8065).

In addition, the Iowa Senate rejected an exception to the Act for abortions necessary to preserve the future fertility of the woman. *See* State of Iowa Senate Journal, Thursday, February 5, 1998, 214–15 (rejecting Amendment S–5022).

### Discussion

Plaintiffs raise a number of questions about the constitutional infirmity of the Act. The court, however, limits itself to the consideration of only two issues and leaves the remaining issues for further briefing and discovery. As the court finds that the plaintiffs have satisfied the requirements of *Dataphase* with regard to each issue considered, these two issues are more than sufficient for purposes of a preliminary injunction.

■■ The first issue is vagueness. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). Due process demands that statutes give fair warning of the conduct that is prohibited. *Id.* Without warning as to the meaning of a statute, people will "steer far wider of the unlawful zone ... than if the boundaries of the forbidden areas were clearly marked." *Id.* at 109 (quoting *Baggett v. Bullitt,* 377 U.S. 360, 372, 84 S.Ct. 1316, 1322–23, 12 L.Ed.2d 377

(1964)). A statute, therefore, is void for vagueness if people of "ordinary intelligence" are forced to guess at the meaning of the statute and differ as to its application. *See Grayned*, 408 U.S. at 108; *Smith v. Goguen*, 415 U.S. 566, 574, 94 S.Ct. 1242, 1248, 39 L.Ed.2d 605 (1974). Moreover, a statute is void for vagueness if it "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with attendant dangers of arbitrary and discriminatory application." *Grayned*, 408 U.S. at 109, 92 S.Ct. at 2299.

■ Perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. *Village of Hoffman Estates v. Flipside, Hoffman Estates Inc.*, 455 U.S. 489, 499, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982); *Colautti v. Franklin*, 439 U.S. 379, 391, 99 S.Ct. 675, 683, 58 L.Ed.2d 596 (1979)(invalidating criminal abortion statute as impermissibly vague on its face). In addition, the level of certainty that due process requires is higher when a statute imposes criminal penalties. *Kolender v. Lawson*, 461 U.S. 352, 358 n. 8, 103 S.Ct. 1855, 1859 n. 8, 75 L.Ed.2d 903 (1983). Failure to satisfy the more stringent standard in cases where constitutional rights or criminal penalties are involved necessitates a finding that the law is unconstitutionally vague. *Evans v. Kelley*, 977 F.Supp. 1283, 1304 (E.D.Mich.1997) (citing *Kolender*). This is true even though the law could conceivably have some constitutional applications. *Colautti*, 439 U.S. at 391, 99 S.Ct. at 683; *Kolender*, 461 U.S. at 358, 103 S.Ct. at 1859.

■ Plaintiffs argue that the term "partial-birth abortion" is not recognized in the medical community and that the prohibited conduct easily captures many of the procedures previously discussed. Plaintiffs argue, for example, that it is not clear whether partial vaginal delivery means partially delivering an intact fetus or delivering a part of a fragmented fetus or both situations. They also argue that the term "living fetus" in this context is vague and exacerbates the other interpretive problems doctors must face regarding many abortion procedures at any time during the pregnancy. The earlier discussion of D & E procedures and suction curettage, which are uncontested as a factual matter, clearly demonstrate that portions of the fetus may be present in the vagina while others remaining in the uterus still have a heartbeat or other sign of "life."

The State responds that the Act bans only one specific procedure: D & X (dilation and extraction), sometimes known as *intact* dilation and evacuation. The State claims that the Iowa law was meant to follow the attempted federal ban on "partial-birth abortion." The federal ban and its legislative history, in turn, is meant to conclusively demonstrate that the ban (both in Iowa and federally) is meant to affect only one procedure. The direct legislative history offered by the State, however, is minimal and is easily overshadowed by plaintiffs introduction of statements by the federal bans sponsor to the effect that more than one procedure was the target.

Plaintiffs rightly point out that language that would have expressly limited the reach of Iowa's ban to D & X procedures was specifically rejected by both chambers. The States' response in oral argument that the Iowa legislature "did not want to pin itself down too narrowly" directly contradicts its earlier claim that only one procedure is at issue here.

The State's final argument is that the intent requirements within the Act cure any problems of vagueness. The State claims that procedures such as D & E and suction curettage do not "typically" involve the scenarios indicated by the plaintiffs' descriptions. In this court's estimation, however, this is too fine and wavering a point upon which to hang such an important right.

The court finds that, on the basis of the record and arguments before it at this time, plaintiffs would clearly prevail on this issue if a final determination on the merits were required.

The next issue the court considers is whether Section 707.8A constitutes an undue burden on womens' right to an abortion as protected under the Constitution. *In Planned Parenthood of Southeastern Penn-*

*sylvania v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), the Supreme Court affirmed the central holding of *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), that a woman has a constitutional right to terminate her pregnancy before viability and the State may not prohibit any woman from making that ultimate decision. The Court also reaffirmed *Roe's* holding that "subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Casey,* 505 U.S. at 879, 112 S.Ct. at 2821 (quoting *Roe,* 410 U.S. at 164–65, 93 S.Ct. at 732).

The plurality, however, rejected *Roe's* "rigid" trimester framework because they believed it undervalued the State's interest in life. Under the trimester framework, almost all abortion regulations were prohibited during the first trimester of pregnancy. During the second trimester, regulations were permitted to protect the woman's health, but not to further the State's interest in potential life. During the third trimester, laws regulating or prohibiting abortion were allowed provided that the life or health of the mother was not at stake. Instead of this framework, the plurality in *Casey* drew the line at viability and recognized the State's interest in promoting life even in the earliest stages of pregnancy. The Court declared: "Only where state regulation imposes an undue burden on a woman's ability to make this decision does the power of the State reach into the heart of the liberty protected by the Due Process Clause." 505 U.S. at 874, 112 S.Ct. at 2819. In the Court's view, "the undue burden standard is the appropriate means of reconciling the State's interest with the woman's constitutionally protected right." 505 U.S. at 876, 112 S.Ct. at 2820.

The Court clarified that a state regulation imposes an undue burden when it has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus. 505 U.S. at 877, 112 S.Ct. at 2820. "A statute with this purpose is invalid because the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it." *Id.* Moreover, the Court stated that state regulations that promote the health or safety of a woman seeking an abortion are valid, unless they have the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion.

The undisputed evidence is that through 13 weeks measured from the first day of the woman's last menstrual period (lmp), physicians rely almost entirely on suction curettage. Furthermore, after approximately 13 weeks of pregnancy lmp, the vast majority of abortions (96%) use D & E. After approximately 15 weeks, the only safe, routinely performed procedure is induction (4% of post-first-trimester terminations nationwide). Once again, these facts are undisputed.

■■ The plaintiffs argue that for primarily the same reasons the Act is vague, its sweep is broad enough to encompass all pre-viability procedures listed in the above paragraph except for induction. This, plaintiffs argue, is in direct contravention of *Casey.* On the basis of the record and arguments as they now stand, the court is inclined to agree. The Court clearly held in *Casey* that the State's interest in potential life "is insufficient to justify a ban on abortions prior to viability even when it is subject to certain exceptions." *Casey,* 505 U.S. at 871, 112 S.Ct. at 2817. A ban such as that embodied in Section 707.8A is *per se* invalid as a matter of law.

■■ Turning to the *Dataphase* factors of likely success on the merits, irreparable harm, public interest, and the balance of hardships, plaintiffs have shown likely success on the merits of their claims. They have established that Iowa Code § 707.8A is unconstitutionally vague and unduly burdensome on a woman's constitutional right to an abortion. In turn, this court has declared the statute likely invalid and unconstitutional. Because the statute infringes on the constitutional rights of women, plaintiffs have also shown that they and their patients would suffer irreparable harm if the court permitted the statute to go into effect. Likewise, the public interest is served by our determi-

nation that the statute is unconstitutional because, in so doing, we protect the constitutional rights of those who are affected by the statute. Finally, the balance of hardships in this case favors the plaintiffs. The protection of constitutional rights clearly outweighs any interest the State may have in promoting the interests of the fetus with a statute that is unconstitutional.

### Conclusion

As another court confronted with a similar task stated:

> We know three things with certainty. We know the turmoil the abortion controversy causes the citizens [of our state]. We also know as unelected judges that we are not "free to invalidate state policy choices with which we disagree." *Casey*, 505 U.S. at 849, 112 S.Ct. at 2806. Finally, and despite the first two points, we know we are not free to "shrink from the duties of our office." *Id.* To this end, we have ruled as we believe the law, interpreted by the Supreme Court, requires—nothing less and nothing more.

*Carhart v. Stenberg*, 972 F.Supp. 507, 531 (D.Neb.1997).

The following is **HEREBY ORDERED:**

1. Plaintiffs' request for a preliminary injunction is **GRANTED**.

2. The court determines that under Federal Rule of Civil Procedure 65, a bond in the amount of $100 is sufficient and directs Plaintiffs to post such a bond.