**CAUSEWAY MEDICAL SUITE et al.**

v.

**Murphy J. FOSTER, Jr.**

**Civil Action No. 97–2211.**

United States District Court,
E.D. Louisiana.

March 17, 1999.

Priscilla J. Smith, Michael Erdos, Kathryn Kolbert, Center for Reproductive Law & Policy, New York City, William E. Rittenberg, Rittenberg & Samuel, LLC, New Orleans, LA, for Causeway Medical Suite, Bossier City Medical Suite, Hope Medical Group for Women, Delta Women's

Clinic, Women's Health Clinic, A. James Whitmore, III, M.D.

Sidney M. Bach, Bach & Wasserman, Metairie, LA, for Ifeanyi Charles Okpalobi, M.D.

Dorinda Chiappetta Bordlee, Law Offices of Dorinda C. Bordlee, Metairie, LA, Roy A. Mongrue, Jr., Louisiana Dept. of Justice, Civil Division, Baton Rouge, LA, for Murphy J. Foster, Jr., Richard P. Ieyoub.

Jane L. Johnson, Terry A. O'Neill, New Orleans, LA, for American Civil Liberties Union Foundation of Louisiana.

PORTEOUS, District Judge.

Before this Court are cross Motions for Summary Judgment that came for hearing on a previous date. Oral arguments were heard on Thursday, November 19, 1998 and the matter was taken under submission. Having heard the arguments of counsel and having studied the legal memoranda submitted by the parties, this Court is fully advised on the premises of the case and sits ready to rule.

### *AMENDED ORDER AND REASONS*

James Madison, the father of our Constitution, wrote that, "judicial precedents, when formed on due discussion and consideration, and deliberately sanctioned by reviews and repetitions [are] binding force ... because it is a reasonable and established axiom, that the good of society requires that the rules of conduct of its members should be certain and known, which would not be the case if any judge, disregarding the decision of his predecessors, should vary the rule of law according to his individual interpretation of it." *James Madison, The Mind of the Founder: Sources of the Political Thought of James Madison* 338–339 (Marvin Meyers ed., 1981), *quoted by* William D. Badar, *Meditations on the Original: James Madison, Framer with the Common Law Intentions—Ramifications in the Contemporary Supreme Court,* 20 Vt.L.Rev. 5, 9

(1995). His respect for Constitutional precedent was no less. Madison maintained that a judge must follow constitutional precedents, rather than "his solitary opinions as to the meaning of the law or Constitution." *Id.* While the body of the Constitution is silent on abortion, the Supreme Court, in interpreting the constitutionality of abortion laws, provided a protected right. This Court will rule accordingly.

This case presents a challenge to the constitutionality of Act 906 of the 1997 Louisiana Legislature (previously Senate Bill 943), which was to have been effective upon the Governor's signature. However, on Monday, July 14, 1997, this Court issued a temporary restraining order enjoining the defendants from enforcing Senate Bill 943. (Doc. 3). On Monday, July 21, 1997, the parties stipulated to a conversion of the temporary restraining order into a preliminary injunction until an adjudication on the merits. (Doc. 5). Plaintiffs now seek a permanent injunction from this court to prevent defendants from enforcing Act 906, the "Partial Birth Abortion Act." Act 906 reads as follows:

> To enact R.S. 14:32.9 and R.S. 40:1299.35.3, and to amend and reenact R.S. 40:1299.35.1(1), relative to abortion; to provide for the crime of partial birth abortion; to provide for penalties; to provide for the prohibition of the performance of partial birth abortions by a physician or any other person except where necessary to preserve the life of the mother; to provide for civil remedies; to provide definitions; to provide for severability; and to provide for related matters.

Be it enacted by the Legislature of Louisiana:

Section 1. R.S. 14:32.9 is hereby enacted to read as follows:

Section 32.9 Partial birth abortion

A.(1) Partial birth abortion is the performance of a procedure on a female by a licensed physician or any other person whereby a living fetus or infant is partially delivered or removed from the fe-

male's uterus by vaginal means and with specific intent to kill or do great bodily harm is then killed prior to complete delivery or removal.

(2) As used in this Section, the terms "fetus" and "infant" are used interchangeably to mean the biological offspring of human parents.

B. It shall not be unlawful for a licensed physician to perform a partial birth abortion where the procedure is necessary to save the life of the mother because her life is endangered by a physical disorder, physical illness or physical injury, and further provided that no other medical procedure would suffice for that purpose.

C. As used in this Section, the term "person" shall not include the female upon whom the partial birth abortion is performed, and she shall not be subject to prosecution hereunder or as accessory to the offense or as a co-conspirator thereto.

D. Whoever commits the crime of partial birth abortion shall be imprisoned at hard labor for not less than one nor more than ten years or fined not less than ten thousand nor more than one hundred thousand dollars.

Section 2. R.S. 40:1299.35.3 is hereby enacted to read as follows:

Section 1299.35.3. Partial birth abortion

A. No licensed physician or any other person shall perform a partial birth abortion on a female unless the procedure is necessary to save the life of the female because her life is endangered by a physical disorder, physical illness or physical injury; and further provided that no other medical procedure would suffice for that purpose.

B.(1) As used in this Section, partial birth abortion means the intentional performance of a procedure on a female by a licensed physician or any other person whereby a living fetus or infant is partially delivered or removed from the female's uterus by vaginal means and then killed prior to complete delivery or removal.

(2) As used in this Section, the terms "fetus" and "infant" are used interchangeably to mean the biological offspring of human parents.

C. There is hereby created a cause of action against the licensed physician or any other person who performs a partial birth abortion for civil damages for survival and wrongful death as more fully set forth in Louisiana Civil Code Articles 2315.1 and 2315.2, except that such causes of action shall only be in favor of the natural or biological father of the aborted infant or fetus, the mother of the aborted infant or fetus or the parents or guardian on behalf of the mother of the aborted infant or fetus if the mother was a minor at the time of the abortion, unless such person's criminal conduct caused the pregnancy, or the person consented to the partial birth abortion.

Section 3. R.S. 40:1299.35.1(1) is hereby amended and reenacted to read as follows:

§ 1299.35.1. Definitions

As used in R.S. 40:1299.35.0 through 1299.35.18, the following words have the following meanings:

(1) "Abortion" means the deliberate termination of a human pregnancy after fertilization of a female ovum, by any person, including the pregnant woman herself, with an intention other than to produce a live birth, remove an ectopic pregnancy, or to remove a dead unborn child caused by a spontaneous abortion, missed abortion, or inevitable abortion.

Section 4. If any provision or item of this Act or the application thereof is held invalid, such invalidity shall not affect other provisions, items or applications of this Act which can be given effect without the invalid provisions, items, or applications, and to this end the provisions of this Act are hereby declared severable.

Section 5. This Act shall become effective upon signature by the governor or, if not signed by the governor, upon expiration of the time for bills to become law without signature by the governor, as provided by Article III, Section 18 of the Constitution of Louisiana. If vetoed by the governor and subsequently approved by the legislature, this Act shall become effective on the day following such approval.

In sum, the Act makes an abortion provider criminally and civilly liable for performing a "partial birth abortion." While there is no medically recognized procedure known as a "partial birth abortion," the "procedure" itself and the impetus behind this litigation can be better understood with a general overview of standard abortion procedures.

There are several abortion procedures which a physician may choose to perform on a particular patient. For abortions through approximately 13–14 weeks, measured from the first day of the woman's last menstrual period (lmp), most physicians rely on a procedure called vacuum aspiration or suction curettage. (Stubblefield Decl. ¶ 24). In this procedure, the physician inserts a thin tube through the vagina into the uterus and removes the fetus or embryo through suction. Id. Forceps are occasionally used in this procedure to remove the fetus or fetal parts. Id. at 25. After 13–14 weeks of pregnancy lmp, most physicians can no longer rely exclusively on suction to evacuate the uterus. Id. at 26. In the vast majority of such cases, doctors will use the dilation and evacuation (D & E).

In the D & E procedure, a physician causes the cervix to dilate, ruptures the membranes (unless the membranes are already ruptured), and removes the fetus and other products of the pregnancy using a combination of forceps, curettage, and suction. (Stubblefield Decl. ¶¶ 26–27).

Often in this procedure, the calvarium (or skull) is too large to pass through the cervix and the physician must compress it to remove the fetus. (Stubblefield Decl. ¶ 28). For various medical reasons, some physicians use a variation of the D & E procedure that involves intact breech extraction of the fetus, sometimes known as the dilation and extraction or D & X, which is the subject of the instant suit. AMA, Board of Trustees Report 26 (A–97), Late–Term Pregnancy Techniques at 8; (Doc. 24).

In the D & X procedure, also known as the intact D & E or intact D & X, the physician extracts the fetal body feet first to the head, then collapses the skull to complete the procedure. The physician chooses a procedure based on the patient's individual circumstances and medical history. (DeGuerce Supp. ¶ 5). While the different abortion techniques have a general method, each abortion procedure is unique and the physician must adjust his technique to fit a patient's individual circumstances. Id. Nonetheless, in each D & E and D & X procedure a fetus is "partially delivered or removed from the female's uterus by vaginal means," and in each situation, the fetus may still have vital signs until the procedure is complete. (Stubblefield Decl. ¶ 71; DeGuerce Decl. ¶ 12; Whitmore Decl. ¶ 10).

Other abortion procedures include hysterectomy, and hysterotomy. Both procedures involve abdominal surgery and are rarely used as abortion methods, in large part because of the comparably high rates of maternal mortality and morbidity. (Stubblefield Decl. ¶ 35).

While it is important to understand the distinctions being made between the traditional suction curettage abortion procedure, the D & E and the D & X, it is unnecessary to describe in any greater detail each of those procedures.[1] For the court's purposes, it is enough to note that

---

1. For a greater and more detailed look at the procedures discussed above, see, Docs. 24 & 25; Carhart v. Stenberg, 11 F.Supp.2d 1099 (D.Neb.1998); Eubanks v. Stengel, 28 F.Supp.2d 1024 (W.D.Ky.1998).

the distinction between the standard procedures and the D & X is the location of the fetus at the time of fetal demise. In the traditional suction and curettage abortions and D & Es, at no time, theoretically, is the fetus positioned in the vaginal canal prior to fetal demise. The D & X procedure is different in that the physician positions a section of the fetus in the birth canal before fetal demise and prior to extraction.

Here, defendants are suggesting that the D & X procedure is not an abortion procedure, but is actually feticide because once the living fetus is brought into the birth canal, the birth process has begun. According to defendant, once any portion of the fetus enters the birth canal, the pregnancy is over, the birth process has started and life has begun. This definition of birth is *res nova* for the court and a unique new argument in abortion litigation.

## II.  JURISDICTION AND STANDING

This case presents a constitutional challenge to Act 906, La. R.S. § 14:32.9 and La. R.S. § 40:1299.35, under the United States Constitution. Thus, pursuant to 28 U.S.C. § 1331, the court has federal question jurisdiction.

■ A plaintiff must allege a judicially cognizable and redressable injury in order to establish standing and pursue a lawsuit. *See, Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559–60, 112 S.Ct. 2130, 2135–36, 119 L.Ed.2d 351 (1992). To establish standing, a plaintiff must prove: (1) "injury in fact" that is both concrete and particularized, and "actual and imminent," rather than "conjectural or hypothetical"; (2) a causal connection between the injury and the conduct complained of; and (3) it must be likely that a favorable decision will redress the injury. *Id.* In *Planned Parenthood v. Danforth,* 428 U.S. 52, 62, 96 S.Ct. 2831, 2837–38, 49 L.Ed.2d 788 (1976), the Supreme Court recognized physicians' standing to challenge statutes that operate against them in the event they

perform an abortion that does not meet statutory exceptions and conditions. "[T]he physicians clearly have standing...[because], '(t)he physician is the one against whom (the statute) directly operate(s) in the event he procures an abortion that does not meet the statutory exceptions and conditions.  The physician, therefore, asserts a sufficiently direct threat of personal detriment.  They should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'" *Id.* (citing, *Doe v. Bolton,* 410 U.S. 179, 186, 93 S.Ct. 739, 744, 35 L.Ed.2d 201(1973)).  Further, many other courts have recognized physicians' standing and the applicability of *Planned Parenthood v. Danforth* in other partial birth abortion statute challenges across the country.  *See c.f., Planned Parenthood v. Doyle,* 162 F.3d 463 (7th Cir.1998), *Planned Parenthood v. Miller,* 30 F.Supp.2d 1157 (S.D.Iowa 1998); *Planned Parenthood v. Verniero,* 41 F.Supp.2d 478 (D.N.J. 1998).

■ Defendants argue that plaintiffs lack standing to pursue a claim for injunctive relief because the plaintiffs have not alleged that they perform the "partial birth" procedure.  Instead, defendants argue that plaintiffs allege collectively that they "use medical techniques and procedures that may fall within the proscription of the Act." (Doc. 25, citing Complaint at ¶ 16.)  Defendants assert that because the Act is not inclusive of conventional abortion procedures, plaintiffs cannot reasonably fear prosecution under the Act and cannot claim an injury in fact.  Thus, defendants claim there is no case or controversy and plaintiffs have no Article III standing to bring this case.

Plaintiffs are several medical clinics and physicians which provide abortion services in the state of Louisiana.  Plaintiffs maintain they have standing because the plain language of the Act, the testimony of Plaintiffs and their experts, and the construction of similar statutes by numerous

courts, makes the Act applicable to the safe and common abortion procedures performed by Plaintiffs. As such, plaintiffs claim that Act 906 will prevent Louisiana physicians from performing the procedure, although it may be in a patient's best interest, or do so subject to civil and criminal liability.

Although plaintiffs do not allege to perform the D & X procedure, this Court finds that plaintiffs have asserted an injury that is actual and imminent and that is a sufficiently direct threat of personal detriment. The plaintiffs, as many before them, should not be required to await in apprehension of civil or criminal suit as sole means of determining whether the Act covers the conventional procedures that Plaintiffs practice. Consequently, plaintiffs have standing to bring this action and the Court now looks to the merits of the constitutional challenge to Act 906.

## III. LEGAL STANDARDS

■ Injunctive relief is an appeal to this Court's equity jurisdiction; it triggers review within the Court's sound discretion. *See, Meredith v. City of Winter Haven,* 320 U.S. 228, 235, 64 S.Ct. 7, 88 L.Ed. 9 (1943). It is a fundamental teaching of equity that injunctive relief is unavailable when the party seeking relief has an adequate remedy at law and will not suffer irreparable injury if the requested equitable relief is denied. *See, O'Shea v. Littleton,* 414 U.S. 488, 499, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

■ A permanent injunction may be granted only if four factors are established: (1) actual success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) the threatened injury outweighs any damage that the injunction may cause the opposing party; and (4) the injunction will not disserve the public interest. *See, Allied Marketing Group, Inc. v. CDL Marketing, Inc.,* 878 F.2d 806, 809 (5th Cir.1989); *Amoco Prod. Co. v. Village of Gambell, Alaska,* 480 U.S. 531, 546 n.

12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). The parties have been given notice and opportunity to be heard and to brief this matter, and agreed to proceed with cross motions for summary judgment in lieu of a trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2).

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Stults v. Conoco,* 76 F.3d 651 (5th Cir.1996), (citing *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 912–13 (5th Cir.1992)) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. The nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also, Tubacex, Inc. v. M/V Risan,* 45 F.3d 951, 954 (5th Cir.1995).

Thus, where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial." *Matsushita Elec. Industrial Co.,* 475 U.S. at 588, 106 S.Ct. 1348. Finally, the Court notes that the substantive law determines materiality of facts and only "facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

As the present case is a facial challenge to the constitutionality of a legislative act, the material facts that present the legal issues are not in dispute. Therefore, this Court must determine whether the Act is unconstitutional as a matter of law, and thus, justifying injunctive relief.

## III. ABORTION JURISPRUDENCE

### A. Overview

In *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the United Supreme Court held that under the Due Process Clause of the Fourteenth Amendment, a pregnant woman has a constitutional right to choose to terminate her pregnancy before viability. Subsequently, the United States Supreme Court affirmed its recognition of a woman's right to choose, stating that a State may not prohibit a woman from making the ultimate decision to terminate her pregnancy prior to viability. *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). Specifically, the *Casey* Court declared, "The woman's right to terminate pregnancy before viability is the most central principle of *Roe v. Wade*. It is a rule of law and a component of liberty we cannot renounce." *Casey*, 505 U.S. at 871, 112 S.Ct. 2791.

However, a plurality of the *Casey* Court abandoned the trimester framework of *Roe* stating that a State has a profound interest in potential life throughout pregnancy. *Id.* at 870–877, 112 S.Ct. 2791, 112 S.Ct. at 2817–2820. The Court then articulated the "undue burden" standard for evaluating a state regulation on abortion. *Id.* at 875–879, 112 S.Ct. 2791 at 2820–2821. The Court said that a finding of an undue burden "is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 877, 112 S.Ct. at 2820.

This Court acknowledges that the "undue burden" standard applies only to pre-viability abortions. However, the Supreme Court in *Casey* recognized that the State's interest in the life of the fetus allows it to regulate or proscribe abortion after viability, except "where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Casey*, 505 U.S. at 879, 112 S.Ct. 2791.

Plaintiffs challenge Act 906 on its face and for vagueness. Although the United States Court of Appeals for the Fifth Circuit has not previously interpreted *Casey* as having overruled, *sub silentio*, longstanding Supreme Court precedent governing challenges to the facial constitutionality of statutes, *see, Barnes v. Moore*, 970 F.2d 12, 14 n. 2 (5th Cir.1992), *cert. denied*, 506 U.S. 1021, 113 S.Ct. 656, 121 L.Ed.2d 582 (1992), it has recently recognized:

[t]he Supreme court has articulated two approaches to proving a statute is facially unconstitutional. In *United States v. Salerno*, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697(1987), the Court held that in a facial challenge, "the challenger must establish that *no set of circumstances* exists under which the Act would be valid." *Id.* at 745, 107 S.Ct. at 2100(emphasis added). However, in *Planned Parenthood v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), the Court appeared to temper the *Salerno* standard by suggesting that an abortion law is facially valid if *"in a large fraction of the cases in which [the law] is relevant*, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Id.* at 895, 112 S.Ct. at 2830(emphasis added).

*Causeway Med. Suite v. Ieyoub*, 109 F.3d 1096, 1102 (5th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 357, 139 L.Ed.2d 278 (1997). This Court acknowledges that the *Salerno* standard is inconsistent with the rule set forth in *Casey*, however, the Fifth

Circuit has not abandoned the *Salerno* standard and this court is compelled to follow such precedent. Therefore, for Act 906 to be found facially unconstitutional, plaintiffs must prove that there would be no set of circumstances under which this Act could be valid. There are no such circumstances and consequently, the law is constitutionally infirm as explained below.

## B. Right to Privacy

■ The Supreme Court, reaffirming *Roe*, held in *Casey* that women have a constitutional right to privacy which includes a right "to choose to have an abortion before viability and to obtain it with undue interference from the State." *Casey*, 505 U.S. at 846, 112 S.Ct. 2791. Plaintiffs argue that the Act violates a woman's right to privacy by: (1) imposing an undue burden on a woman's right to choose an abortion; (2) impermissibly lacking an adequate health exception for both physical and psychological health; (3) banning virtually all safe pre-viability abortions; and imposing unconstitutional third party consent requirements. The Court finds that Act 906 violates a woman's right to privacy for all of the above reasons and is therefore, unconstitutional.

### 1. Undue Burden on a Woman's Right to Choose

The Act has both the purpose and effect of imposing an undue burden on the woman's right to choose abortion. Under *Casey*,

[a] finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of the woman seeking an abortion of a nonviable fetus. A statute with this purpose is invalid because the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it. And a statute which, while furthering the interest in potential life or some

other valid state interest, has the effect of placing a substantial obstacle in the path of the woman's choice cannot be considered a permissible means of serving its legitimate ends.

*Casey*, 505 U.S. at 877, 112 S.Ct. 2791. Plaintiffs argue that, under the standard set forth in *Casey*, the Act is unconstitutional on its face. It is their contention that the Act's purpose and effect would be to hinder women seeking abortions by prohibiting physicians from performing the most common, most readily available, and safest method of termination available during the first and second trimesters. Defendants argue that *Roe* and *Casey* are inapplicable to Act 906 because *Roe* only provided constitutional protection to a woman's decision whether to terminate her *pregnancy*, focusing again on the term pregnancy and their argument that a woman's right to choose abortion ends as soon as any portion of the fetus enters the vaginal canal. They maintain this position despite the fact that the woman has specifically gone to her doctor's office for an abortion and therefore presumably already made the decision to terminate her pregnancy.

Not every limitation placed on a woman's right to choose abortion will be found to unduly burden that choice. In *Roe*, the Supreme Court held that maternal health and potential life are legitimate state interests for which states may regulate abortions. *Roe*, 410 U.S. at 162, 93 S.Ct. 705. But the Act now in question advances neither maternal health or potential life and clearly would create undue burdens on a woman's right to choose abortion. At most, the Act may force women seeking abortions to accept riskier or costlier abortion procedures which nevertheless result in fetal death. This is conspicuously reflected by the fact that the Act would not apply to a surgical abortion if fetal demise is first induced. Further, although Louisiana has a parturition statute [2] under which

---

**2.** La.R.S. 14:87.1 reads as follows: "Killing of     a child during delivery. Killing a child dur-

the state's noted concerns could be addressed, this Act was intended to be codified under an abortion section—evidencing the state's efforts to restrict abortion access. As the Eighth Circuit held recently, "Where a requirement serves no purpose other than to make abortions more difficult, it strikes at the heart of a protected right, and is an unconstitutional burden on that right." *Planned Parenthood v. Atchison*, 126 F.3d 1042, 1049 (8th Cir.1997). This appears to be the case under the instant Act.

This Court's conclusion that the Act places substantial obstacles in the path of women seeking safe abortions is further supported by other circuit court decisions. Several courts have invalidated "partial birth abortion" laws even though those laws were viewed as banning only *some* safe previability abortion methods. These courts found that limiting only *some* safe previability abortions, as opposed to most or all, still effectively imposed undue burdens on a woman's right to choose to terminate her pregnancy. *See Planned Parenthood v. Woods*, 982 F.Supp. 1369, 1378 (D.Ariz.1997) (holding that "partial birth abortion" ban reached the most common second trimester abortion procedures and therefore unconstitutionally burdened a woman's right to terminate a nonviable fetus); *Planned Parenthood v. Miller*, 63 F.3d 1452 (8th Cir.1995), *cert. denied*, 517 U.S. 1174, 116 S.Ct. 1582, 134 L.Ed.2d 679 (1996) (holding that, under *Casey*, an abortion statute is unconstitutional on its face if it imposes a substantial obstacle in a large fraction of relevant cases); *Evans v. Kelley*, 977 F.Supp. 1283, 1317 (E.D.Mich. 1997); *Carhart v. Stenberg*, 972 F.Supp. 507, 524–25 (D.Neb.1997)(holding that ban of specific procedure performed by plain-

tiff physician subjected his patients to greater risk of injury or death and thus constituted "undue burden"). *Cf. Danforth*, 428 U.S. at 75–79, 96 S.Ct. 2831 (holding that ban on use of saline amniocentesis procedure was unconstitutional).

#### 2. Health and Life Exceptions

The Act fails to preserve the maternal health exception and thus violates the right to privacy. As *Casey* dictates, an indispensable element of an abortion regulation's constitutionality is adequate protection for maternal health throughout pregnancy. 505 U.S. at 879, 112 S.Ct. 2791; *see also id.* at 880, 112 S.Ct. 2791 (". . . the essential holding of *Roe* forbids a State to interfere with a woman's choice to undergo an abortion procedure if continuing her pregnancy would constitute a threat to her health."). After viability, a state "may, if it chooses, regulate, and even proscribe, abortion *except* where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Id.* at 879, 112 S.Ct. 2791 (emphasis added) (citing *Roe v. Wade*, 410 U.S. at 164–65, 93 S.Ct. 705). The after-viability health exception required in *Casey* certainly supports a similar requirement prior to viability if for no other reason but that the state's interest in potential life is not compelling prior to viability.

The Act contains no health exception whatsoever, *see* La. R.S. §§ 14:32.9(B), 40:1299.35.3(A), and is constitutionally infirm on this basis alone. Without the maternal health exception, the Act may leave a woman in deteriorating health related to her pregnancy the "untenable choice" between undergoing a more dangerous pro-

ing delivery is the intentional destruction, during parturition of the mother, of the vitality or life of a child in a state of being born and before actual birth, which child would otherwise have been born alive; provided, however, that the crime of killing a child during delivery shall not be construed to include any case in which the death of a child results from the use by a physician of a proce-

dure during delivery which is necessary to save the life of the child or the mother and is used for the express purpose of and with the specific intent of saving the life of the child or of the mother. Whoever commits the crime of killing a child during delivery shall be imprisoned at hard labor in the penitentiary for life."

cedure in her already fragile condition, "continuing her pregnancy in the face of unknown risks and health concerns," *Hope Clinic,* 995 F.Supp. at 860, or waiting until her death is imminent to have recourse to otherwise banned procedures. *See also,* (Stubblefield Decl. ¶¶ 75–78). The state may not constitutionally restrict a woman to such dangerous options at any stage of pregnancy.

Additionally, while the Act does provide an exception for the life of the mother, this exception is wholly inadequate. The life exception only permits the use of life saving banned abortion procedures when they "[are] necessary to save the life of a mother [whose] life is endangered by a physical disorder, physical illness or physical injury; and *[furthermore only if] no other medical procedure would suffice for that purpose."* La. R.S. §§ 14:32.9(B) (emphasis added), 40:1299.35.3(A). In effect, this provision may force a woman to choose higher risk procedures in her attempt to preserve her own life. For example, if a hysterotomy or hysterectomy would suffice to save a woman's life, the physician must resort to these procedures even though they present far greater risks to the woman's health and may leave her infertile. The constitutional protection of a woman's right to terminate her pregnancy at any stage for the purpose of preserving her life forbids so limited an exception. As the court in *Little Rock Family Planning Services v. Jegley* observed in enjoining Arkansas' "partial birth abortion" ban, "[w]hile [a certain] procedure might 'suffice' to save the woman's life, they certainly have the potential for damaging her health or endangering her life" and could be riskier than another procedure and

thus, medically inappropriate. No. LR–C–97–581, slip op. at 58 (E.D.Ark. November 13, 1998).

For all the reasons stated above, Act 906 is not constitutional. Specifically, it fails to provide a health exception, provides only an inadequate life exception, and deprives physicians of the freedom to exercise their best medical judgment in choosing the most prudent treatment for their patients.

3. Viability

As discussed above, the Act's definition of "partial birth abortion" is so broad as to sweep within its proscription virtually all safe previability abortion procedures. Consequently, it prohibits a woman from making the ultimate decision to terminate her pregnancy before viability, *Planned Parenthood v. Casey,* 505 U.S. 833, 879, 112 S.Ct. 2791, 120 L.Ed.2d 674(1992), and is therefore unconstitutional. A previability ban on abortions is unequivocally unconstitutional. *See, e.g., Sojourner T. v. Edwards,* 974 F.2d 27 (5th Cir.1992), *cert. denied,* 507 U.S. 972, 113 S.Ct. 1414, 122 L.Ed.2d 785(1993). As the Court held in *Casey,* the state's interest in potential life "is insufficient to justify a ban on abortions prior to viability even when it is subject to certain exceptions." 505 U.S. at 871, 112 S.Ct. 2791. Because the Court has ruled that there is no legal justification for banning previability abortions, such a ban is *per se* invalid as a matter of law. *Planned Parenthood v. Miller,* 1 F.Supp.2d 958, 963 (1998)(ban on "partial birth abortion" "*per se* unconstitutional" because it bans almost all previability abortions).[3]

---

**3.** Several courts have enjoined "partial birth abortion" bans because they effectively ban all safe abortion procedures. *See Planned Parenthood v. Miller,* 1 F.Supp.2d 958 (1998); *Hope Clinic,* 995 F.Supp. at 857(1998)(striking Illinois's "partial birth abortion" ban because it could reach suction curettage, D & E, and induction procedures); *Planned Parenthood v. Alaska,* No. 3AN–97–6019 CIV, slip op. at 17 (Alaska Super.Ct. Mar. 13,

1998)(holding that "[t]he Act essentially makes all available abortion procedures illegal" in violation of *Roe* and *Casey*); *cf. Little Rock Family Planning v. Jegley,* No. LR–C–97–581, slip op. at 2 (E.D.Ark. July 31, 1997) (in issuing temporary restraining order, noted that plaintiffs' experts "testified that the language could be construed to include any abortion procedure at almost any state of gestation")

Like these other laws, Louisiana's Act 906 violates the central holding of *Roe* and *Casey;* that a State may not ban pre-viability abortions. *See Casey,* 505 U.S. at 871, 879, 112 S.Ct. 2791; *Roe,* 410 U.S. at 163–64, 93 S.Ct. 705. Defendants maintain that this law is not one addressing abortion, but instead is targeted at infanticide and thus, *Roe* and *Casey* are inapplicable. The State's position is truly a conceptual theory that, as this Court is able to ascertain, has no relationship to fact, law or medicine. This Act has the effect of banning virtually all safe previability abortion procedures and is, therefore, unconstitutional.

### 4. Consent

Act 906 violates the right to privacy by effectively creating an unconstitutional third-party consent requirement. The Act allows a physician to be sued for allegedly performing a "partial birth abortion" by a putative father and a maternal "grandparent" of the fetus unless the person consented to the procedure or criminally caused the pregnancy. By creating civil liability for a physician who fails to obtain consent from these third parties, the Act compels the physician to inquire beyond the patient to the third parties in order protect himself from civil exposure.

In *Casey,* the Supreme Court struck down the spousal consent requirement holding that some women, "may have good reason for not wishing to inform their husbands of their decision to obtain an abortion." *Casey,* 505 U.S. at 893, 112 S.Ct. 2791. Such a requirement may hinder many women from seeking abortions and was, consequently, unconstitutional. *Id.* at 898, 112 S.Ct. 2791. Here the consent requirement is not spousal, but *paternal,* which is even more burdensome. *Casey* notes that it would be unreasonable to consider the father's interest as equal to the mother's before birth. *Id.* at 896, 112 S.Ct. 2791. Because of the undue burden the "father of the fetus" consent requirement places on a woman's right to terminate her pregnancy, Act 906 is unconstitutional.

The Act's parental consent requirement is likewise unconstitutional. The Act establishes a parental consent requirement when the pregnant woman is under the age of 18. Further, the law tacitly requires an unmarried woman of majority age to obtain consent. A state may require parental consent to a minor daughter's abortion decision, however such laws are permissible under the Constitution only if the state provides an adequate judicial bypass procedure. *Bellotti v. Baird,* 443 U.S. 622, 643, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979). Act 906 provides no such bypass and is, therefore, unconstitutional.

### C. Vagueness

Plaintiffs argue that the Act's ban is void for vagueness in violation of the Fourteenth Amendment's Due Process Clause because its definition of the criminalized medical procedures is so imprecise it deprives physicians of fair notice. Plaintiffs assert that the Act's definition of "partial-birth abortion" impermissibly fails to clearly delineate which abortion procedures are proscribed by the Act, leaving physicians to guess as to what conduct will subject them to penalties. Plaintiffs further assert that the Act's definition of "partial-birth abortion" provides no guidance as to what abortion procedures are proscribed by the Act because, a "partial-birth abortion" does not describe a specific medically recognized procedure.

According to plaintiffs, several of the Act's definitional terms are particularly ambiguous. First, the phrase "partially delivered or removed from the female's uterus by vaginal means" is subject to varying interpretations. The term could mean the partial removal from the uterus of an intact fetus, or the removal from the uterus of a part of a disjoined fetus, or both. Second, the term "living fetus" is vague. Plaintiffs question whether the term "living fetus" is one that would be

viable outside of the womb. Faced with the statute's vague language and prospect of arbitrary and discriminatory enforcement, plaintiffs claim that physicians will be chilled from providing patients with the full range of appropriate medical choices for fear of criminal sanctions and loss of their license.

Defendants argue that the Act's location-based definition has clear wording that bans any infanticidal procedure in which a physician has specific intent to kill a living human being that has been partially delivered into the vaginal canal. According to defendants, that includes the intact D & X procedure as well as any variation of that procedure in which the fetal demise is intended and occurs in the vaginal canal. Defendants assert that although "partial birth abortion" is not a medical term, it is the legal nomenclature that the Louisiana legislature has attached to a procedure by which fetal demise occurs in the vaginal canal.

■ Due process prohibits laws so vague that persons "of common intelligence must necessarily guess at [their] meaning and differ as to [their] application." *Smith v. Goguen*, 415 U.S. 566, 572 n. 8, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974) (citations omitted). To comport with due process, a statute must give fair warning as to what conduct is forbidden. *See Village of Hoffman Estates v. Flipside, Hoffman Estates Inc.*, 455 U.S. 489, 499, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); *Colautti v. Franklin*, 439 U.S. 379, 390, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979), overruled in part on other grounds, *Webster v. Reproductive Health Servs.*, 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989); *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Without such a warning, people "steer far wider of the unlawful zone ... than if the boundaries of the forbidden areas were clearly marked." *Grayned*, 408 U.S. at 108, 92 S.Ct. 2294 (*quoting Baggett v. Bullitt*, 377 U.S. 360, 372, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964)).

Vague laws offend due process in two respects. First, they fail to provide the persons targeted by the statutes with "a reasonable opportunity to know what conduct is prohibited so that [they] may act accordingly." *Grayned*, 408 U.S. at 108, 92 S.Ct. 2294; *Margaret S. v. Edwards*, 794 F.2d 994, 999 (5th Cir.1986)(statute prohibiting "experimentation" on "unborn child" void for vagueness). Second, by failing to provide explicit standards for those who apply them, vague laws "impermissibly delegate basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned*, 408 U.S. at 108–109, 92 S.Ct. 2294; *see also Margaret S.*, 794 F.2d at 999 (statute "enforceable only on the exercise of an unlimited and hence arbitrary, discretion vested in the state" void for vagueness).

■ A higher degree of clarity is required when "uncertainty induced by the statute threatens to inhibit the exercise of constitutionally protected rights." *Colautti*, 439 U.S. at 391, 99 S.Ct. 675; *see also Hoffman Estates*, 455 U.S. at 499, 102 S.Ct. 1186 ("Perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights."). A statute will be struck as unconstitutionally vague for failure to satisfy this heightened standard, even if it "could conceivably have had some legitimate application." *Kolender v. Lawson*, 461 U.S. 352, 358, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); *see also Hoffman Estates*, 455 U.S. at 494–95, 102 S.Ct. 1186; *Colautti*, 439 U.S. at 390–91, 99 S.Ct. 675; *Planned Parenthood of Wis. v. Doyle*, 162 F.3d 463, 469 (7th Cir.1998) ("[A] statute that punishes a class of constitutionally punishable abortions so vaguely that it makes doctors afraid to perform constitutionally permissible abortions is quite likely to infringe constitutional rights.").

The Act bans "partial birth abortions." As defined in the Act, a "partial birth abortion" is "the performance of a procedure on a female by a licensed physician or any other person whereby a living fetus or infant is partially delivered or removed from the female's uterus by vaginal means and with specific intent to kill or do great bodily harm is then killed prior to complete delivery or removal." La.R.S. 14:32.9(A)(1).

When applying the definitional elements of "partial birth abortion," as defined by the Act, to common abortion procedures performed by the plaintiffs, physicians using sound medical judgment are at risk of prosecution. The phrases "living fetus," "partially delivered or removed ... by vaginal means," and "specific intent to kill" are particularly ambiguous and subject to various interpretations. In almost every abortion procedure, the physician always intends to deliver the fetus into the vagina. The vaginal delivery is a necessary step in every safe and common method of abortion. Further, it is unclear whether "living fetus" refers to a fetus with a heartbeat and vital signs or to a viable fetus capable of living outside of the womb. Also, the Act does not specify how much of the fetus must be "delivered" for it to be considered "partially" delivered. According to Dr. Stubblefield, "delivery" is given a broad meaning in obstetrics. (Stubblefield Decl. ¶ 68). Anything that is removed from the uterus, whether an intact fetus, fetal part or baby, is "delivered." *Id.* Consequently, as currently written, "partially delivered" encompasses within its scope of prohibited conduct regularly performed abortion procedures because in all abortion procedures, except hysterectomy and hysterotomy, a fetus or fetal part is "delivered."

Defendants argue that the strong *mens rea* requirement distinguishes Louisiana's partial birth abortion statute from that of other states. According to defendants, the specific intent to kill in a specific location makes the statute less vague. The Court disagrees. Fetal demise is the *raison*

*d'etre* for abortion procedures. By definition, a physician performing an abortion has a "specific intent to kill." The *mens rea* requirement does not make the statute any less vague, rather, the "Act leaves physicians to fear that any abortion procedure could subject them to criminal liability." (Stubblefield Decl. ¶ 74).

The phrase "partial-birth abortion" is not a medically recognized procedure and physicians are, consequently, rather dependant on the language in the Act to determine the scope of the prohibited procedure. However, the record reflects that there is, not surprisingly, a great deal of disagreement among the experts in this proceeding over which procedures are prohibited by the Act.

Defense experts Dr. Jack Andonie and Dr. Raymond Frank Gasser both attest that the Act does not proscribe the destruction of a fetus *in utero*, but proscribes only those procedures designed to ensure demise to a fetus that is partially out of the uterus. (Andonie Decl. ¶¶ 15–16, Gasser Decl. ¶ 8). Further, defense experts assert that the act clearly applies to only the D & X procedure. (Andonie Decl. ¶ 17, Gasser Decl. ¶ 20).

Plaintiffs' experts have come to the opposite conclusion. Dr. James DeGuerce attests that as currently written, the law would apply to some of the D & E procedures he routinely performs. (DeGuerce Decl. ¶ 12). Dr. James Whitmore attests that the law would subject him to criminal investigation for every second trimester abortion he performs. (Whitmore Decl. ¶ 12). Further, Dr. Phillip Stubblefield attests that the Act's lack of clarity creates a ban on almost all abortions and will compromise physicians' ability to practice medicine. (Stubblefield Decl. ¶¶ 64–65).

Defendants argue that the legislature has the unique responsibility to define crimes and punishments, and that the legislature's naming and defining the crime of partial birth abortion is a constitutional exercise of the legislature's police power.

Defendants claims that Act 906 does not and was not intended to encompass abortions done by suction curettage, traditional D & E, or induction. Further, the defendants assert that Louisiana's unique scienter requirement is the "most clear" of all partial birth statutes nationwide. (Doc. 26, n. 4).

The Louisiana Supreme Court holds that, under the Louisiana Code, a court must give words of a law their generally prevailing meaning, *Backhus v. Transit Cas. Co.*, 549 So.2d 283, 289 (La.1989), however "the paramount consideration for statutory interpretation is the legislative intent and the reason[s] which prompted the legislature to enact the law." *Causeway Medical Suite v. Ieyoub*, 109 F.3d 1096, 1107 (5th Cir.1997), (citing *Fontenot v. Chevron U.S.A., Inc.*, 676, So.2d 557, 562 (La.1996)).

Defendants assert that the legislative intent behind the statute is to prevent the killing of a child during delivery. According to the legislature, a partial birth abortion is not an abortion procedure, but is actually infanticide because once the fetus has entered the vaginal canal, pregnancy is over and birth has begun. Defense experts corroborate that contention stating that, "the inevitable and unstoppable process of birth begins once . . . any part of the fetus is delivered or removed from the uterus into the vaginal canal." (Doc. 26, citing Andonie and Gasser Decls.)

It should be noted that the "process of birth," as considered in the context of a D & X procedure, is artificially induced for that particular abortion procedure. In other words, a physician begins an abortion procedure, then to complete that procedure, induces "birth." So, despite legislative intent, intentions cannot surmount clearly established constitutional precedent. The fact remains that the partial birth abortion procedure is just that, an abortion procedure—not infanticide. Like Chief Judge Posner, this Court does not question the state's right to regulate medicine nor question its right to define criminal law. However, "that right is limited by the constitutional rights of the persons whose conduct the state seeks to punish." *Doyle*, 162 F.3d at 470. Although this law seeks to punish physicians for performing "partial birth abortions", it is the woman seeking a safe abortion who will suffer. And although the legislature "intends" to create civil and criminal liability for performing a partial birth abortion, the impermissibly vague language of the statute encompasses more.

Courts have not tolerated vagueness in laws regulating abortion, including those that restrict the procedures physicians may use. In *Colautti*, for example, the Supreme Court held impermissibly vague a state abortion statute requiring a physician to adopt a particular standard of care whenever the physician determined that a fetus "[was] viable" or "there [was] sufficient reason to believe that the fetus may be viable." 439 U.S. at 391, 99 S.Ct. 675. The Court emphasized that, while "viable" and "may be viable" presumably had different meanings, a physician could not know from the statute what they were because the law provided no guidance. "Instead, it condition[ed] potential criminal liability on confusing and ambiguous criteria." *Id.* at 394, 99 S.Ct. 675. It was therefore void for vagueness.

Relying on these principles, several federal district courts have recently enjoined "partial-birth abortion" bans that were virtually indistinguishable from Act 906. In *Woods*, the district court held that the meaning of Arizona's "partial-birth abortion" ban was ambiguous and the statute could "reasonably be interpreted differently by people of common intelligence." 982 F.Supp. at 1379. That ambiguity was due in part to the fact that the statute did not describe a specific abortion procedure, delivery of the fetus into the vagina occurs as part of several abortion procedures, and the statute was not limited to any stage of pregnancy. *Id.* at 1378. Because the law did not give physicians performing abortions "fair warning . . . 'as to what conduct

is permitted, and as to what conduct will expose them to criminal and civil liability,'" the court held the Arizona law to be unconstitutionally vague. *Id.* at 1379 (quoting *Voinovich,* 911 F.Supp. at 1067).

Additionally, in *Planned Parenthood of Greater Iowa v. Miller,* 30 F.Supp.2d 1157 (S.D.Iowa 1998), the district court found Iowa's partial birth abortion statute unconstitutionally vague. According to Judge Pratt, the Iowa Act's prohibitions were not, "clearly defined and do not give fair warning of the scope of the prohibited conduct." *Id.* at 1165. Such ambiguity is reflected in the, "considerable uncertainty within the medical community as to the meaning of the plain language of the Act." *Id.*

Like those above, this Act's broad language seems to purposefully create confusion and ambiguity. Defendants' claim that this law applies only to the D & X procedure is not particularly credible. Were that the case, the legislature could have done a number of things to ensure that application.

The Supreme Court stated and affirmed a woman's constitutional right to choose to terminate her pregnancy. Louisiana seeks to limit that right by criminalizing the choice that is *not* within a woman's control, *i.e.* which abortion procedure best fits her medical needs. A slippery slope toward diminishing firmly established precedent would surely result if this Court permitted the State's back door effort to limit that right.

## IV. CONCLUSION

The plaintiffs are entitled to a permanent injunction. Because plaintiffs established that Louisiana's partial birth abortion statute is facially unconstitutional and vague, they have proven actual success on their challenge to the constitutionality of the statute; failure to grant this permanent injunction will result in irreparable injury because the constitutional right to privacy is threatened and impaired, *see, Deerfield Medical Center v. City of Deer-* *field Beach,* 661 F.2d 328 (5th Cir.1981); the threatened injury of unduly burdening a woman in her decision to terminate her pregnancy by criminalizing a procedure in such as way as to chill abortion providers from practicing their profession greatly outweighs any damage the injunction may cause the state; and the injunction, in no way deserves public interest. In fact, the injunction serves the public well in that this Court follows well-established precedent, just as Madison intended.

Accordingly,

**IT IS ORDERED** that Plaintiffs' Motion for Summary Judgment be, and the same is hereby **GRANTED.**

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment be, and the same is hereby **DENIED.**